STATE v. ANDREW BRINKLEY, Appellant.—No. 39557.—193 S. W. (2d) 49.

Division Two, March 11, 1946.

1052

*Ivan H. Light* and *Victor Packman* for appellant.

1054

1056

1058

1060

*J. E. Taylor*, Attorney General, and *Frank W. Hayes*, Assistant Attorney General, for respondent.

1062

ELLISON, P. J.—The appellant was convicted by a jury in the circuit court of the City of St. Louis of murder in the second degree, as an habitual criminal, and his punishment assessed at the maximum of life imprisonment in the state penitentiary.[1] He is the same person as the appellant in State v. Brinkley, 354 Mo. 337, 189 S. W. (2d) 314, decided last fall; and is represented by the same chief counsel, who was appointed by the circuit court in both cases. The homicide admittedly was committed by appellant at an apartment at 3837 Washington Avenue in St. Louis on the late afternoon of September 12, 1943, in a fist and foot fight between him and the deceased, Gloid Parker, a soldier then stationed at Jefferson Barracks. No weapons were used, except insofar as the shoes on appellant's feet could be called weapons when employed in kicking Parker. The main substantive legal defense is that the killing was justifiable or excusable within the meaning of Sec's. 4379 and 4380.

The apartment was tenanted by both male and female roomers, and the implication from the appellant's brief is that the place was in the nature of a brothel. Howard Glines was the proprietor and was also engaged in the roofing business. His father "Pop" Glines and

[1] Under Secs. 4377, 4378, 4854, 4855, R. S. 1939, and Mo., R. S. A. All subsequent references to our statutes are to these same sources unless otherwise stated.

appellant Brinkley both worked for him at that trade, and lived at the apartment—Brinkley at least a part of the time sleeping on a couch in the hall. The deceased Parker, with another soldier, had come that afternoon, equipped with contraceptives, seeking a woman who was Parker's special friend, but she was away from home.

Appellant's version of the facts, synthesized from his own testimony and the conflicting stories of several witnesses, is that Parker thereupon, and after there had been considerable drinking of intoxicants, made unwelcome advances to another roomer named Mildred Ackerman, a married woman who was the paramour of proprietor Glines, a married man. Pop Glines, looking after the interest of his son in that woman, intervened and Parker slapped Pop Glines. The latter summoned appellant Brinkley, who testified he found Parker trying to break through the door into the room where the woman was; and that Parker tried to hold onto her. Appellant declared he endeavored to quiet the disturbance whereupon Parker became the aggressor in a fight between them, following which he died at a hospital about seven hours later.

An examination of the testimony of the several witnesses shows that while the witness Mildred Ackerman did testify Parker made improper advances to her, she did not say they were accompanied by physical violence. And it was a disconnected and later occurrence when Parker slapped Pop Glines. She said she was talking to Glines in his room when "Parker came in. I don't know what he was—but for some reason he came over and slapped Mr. Glines." On the other hand Pop Glines (50 years old) admitted he had been drinking all day. He said Parker at one time had hold of the Ackerman woman; but he denied that Parker slapped him at any time that he knew of. Furthermore, Mildred Ackerman testified the door to Pop Glines' room was not broken in the fight between Parker and appellant Brinkley, or by either of them, but that Howard Glines, the proprietor, did that or said he did. Parker's soldier companion testified appellant Brinkley encouraged them to make advances to the Ackerman woman and another. This Brinkley denied, but he stated he didn't care what they did to the women because they were not his girls.

The fight started at the back of the apartment near Pop Glines' room in a cross-hall, and continued through the main hallway leading to the front door, and thence out on the front porch and steps to the ground. Brinkley testified that early in the struggle he got his arm around Parker and the latter crashed into a stairway bannister in the hall, and another time against the door of one of the rooms. There were other obstructions in the hall against which one might have fallen, such as Brinkley's couch, radiators, doorknobs, etc. A female spectator testified that once appellant Brinkley was on the floor and "the soldier" (Parker) kicked him when he was down. She thought

the soldier used jujutsu to throw him. Another time Parker's soldier companion got between the two fighters, momentarily stopping the struggle because Brinkley complained of being at a disadvantage from an arm he had fractured a little over a month earlier, and of not wanting to fight. But when the other soldier thus parted them, Brinkley hit Parker a wallop in the stomach and the struggle continued. As we understand Brinkley's confusing testimony, the first time he got mad during the fight was when Parker hurt his broken arm either by slamming him against the wall, or by kicking him when he was down on the floor.

At any rate, they fought through the hall onto the front porch, down the front steps, against a tree and on the sidewalk. At that point Brinkley said he hit Parker in the temple, knocking both of them out because his own head hit the cement walk as he swung and fell. He didn't remember what occurred after that. Three witnesses testified that between 5 and 5:20 P. M. they saw Parker lying helpless in front of the apartment, partly on the sidewalk and partly on the ground near an automobile truck; and that appellant Brinkley held on to the truck and kicked Parker on the head repeatedly. His shoes had metal plates on both the toes and heels. These witnesses were Mrs. Catherine Glines, wife of proprietor Glines, who was not living with him at that time, and Mrs. Kathleen Hardin and Mrs. Elverna Hurst, neighbors. The latter called the police. Parker's soldier companion testified to the same assault, but estimated the number of kicks Brinkley inflicted on Parker at three or four. When cross-examined on this point, appellant Brinkley said he had begun to regain consciousness at the time mentioned by these witnesses, and he denied kicking Parker on the head at all.

After the assault Brinkley left the scene thereof in some haste, but presently returned with proprietor Glines and his wife. The police got there about 6 or 6:30. Parker was unconscious. His soldier companion identified Brinkley as the assailant and the police arrested him. He was lying on a pallet on the floor. They said that when he was asked if he had had a fight with Parker he replied, "Yes, I did. I tried to kick the s-o-a-b's head off." And he also made a lunge at the soldier, who had identified him, saying "I ought to knock your m-f head off." Afterwards he was very profane and two additional officers were summoned. He thought the police were too rough with him, but quieted down when they explained they were merely investigating the facts. Brinkley's counsel offered to prove that his antagonism was directed toward the police because he thought they were going to accuse him falsely and beat him as in the notorious Melendes case, mentioned in the first paragraph of this opinion. The court excluded that tendered proof as to the Melendes case.

An autopsy was performed the next morning by an army surgeon, Major Bernhard. His findings were reviewed by Dr. Connor,

coroner's autopsical surgeon, after examining the corpse. The autopsy disclosed extensive bruises or lacerations over the hands, arms, chest, knees, thighs, scrotum, face and head. Particularly severe were the bruises on the left side of the face, temple, ear and eye. Over that ear was an oval shaped, depressed, hinged fracture about .75 by .6 inches and .25 inches deep. One doctor said it was smaller than a dime. The other described it as a little larger than the middle knuckle of his doubled index finger. The area over the fracture was bruised and hemorrhagic, but the skin was not lacerated or torn. Within the skull cavity a hemorrhage surrounded the brain sack. In the opinion of the surgeons the chain of causation was that some trauma caused the skull fracture, which ruptured an artery and caused the hemorrhage, and the latter in turn subjected the brain to pressure and resulted in death.

It was undisputed that the primary cause of death was the trauma which produced the skull fracture. But the parties are not in accord as to the cause of that trauma. Both surgeons readily agreed the fracture could have been caused by the kicks from appellant's shoes, although neither was willing to exclude every other possibility. Major Bernhard wouldn't say whether it could have been caused during the fight by collision with certain objects and projections in the hallway, appearing in photographs shown to him. But he stated any blunt object an inch or two wide might have caused it. Looking at a photograph of the automobile truck near which the fight ended, he pointed out three objects thereon which he said possibly might have produced the fracture at certain angles; and he added the same might be true of the ring on a man's hand. Later the appellant testified he was wearing a ring during the fight and that he hit Parker one blow on the left temple with his right hand. He was also wearing a ring at the trial, but the record does not show on which hand. Dr. Connor's testimony was negative or unresponsive as to any specific cause of the skull fracture except kicking with the toe of a shoe. However he would not say that did cause it.

In logical order appellant's first assignment of error is that the State failed to make a case for the jury because there was no substantial evidence tending to prove Parker's death was produced through the criminal agency of appellant. This contention is based on three theories: (1) that the manner of assault submitted was not proven; (2) that it is a matter of speculation as to what caused the skull fracture and death; (3) that the fracture may not have been directly caused by a blow at all, but may have resulted from Parker's reeling from a blow delivered by appellant, and thereby striking his head against some hard object which produced the fracture.

 On the first of these theories appellant relies on State v. Lloyd, 337 Mo. 990, 997, 87 S. W. (2d) 418, 422(7). There, the State's main instruction submitted the cause to the jury on the sole

theory that the defendant fatally assaulted the deceased with an unknown dangerous weapon. But all the eyewitnesses declared it was only a fist fight and saw no weapon. The examining physician said the deceased's wound might have been caused by falling against something, or by the heel of a shoe. The witnesses agreed the deceased did fall against a standing automobile, but no one testified to the use of a shoe in the fight. [An automobile while standing would hardly be a dangerous weapon, but might be so used as to become one—as by driving it against someone. 11 Words & Phrases (Perm. Ed.), pp. 81, 131.] In these circumstances the Lloyd decision ruled the foregoing evidence was not substantial as to the use of a dangerous weapon.

But there is no comparison between the Lloyd case and this one. Here both the information and the instructions charged the appellant committed the assault with his fists and feet; and the proof shows without dispute that his assault was so committed, and that it resulted in Parker's death. Neither the information nor the instructions alleged the use of a dangerous weapon, but appellant's use of his leather soled shoes to kick a prone and helpless victim in the head undoubtedly would make them dangerous weapons.[2] So the State really overproved its case as pleaded and submitted by the instructions.

On the second theory, appellant's brief contends the State's evidence as to what caused the skull fracture was only conjectural, because the two surgeons merely said it *could* have been caused by kicking; and Major Bernhard also testified it *possibly* might have been caused by Parker's head striking against any of three different objects on the automobile truck, or from being struck by the ring on appellant's finger. In fact, he conceded on cross-examination that a determination of the ▮ exact cause of the skull fracture would range into the field of speculation to a certain extent. Appellant argues there was no substantial proof that the fracture was caused in any particular one of these several ways, as against the others; and that consequently the evidence was left in equipoise and was speculative, citing Berry v. K. C. Pub. Serv. Co., 341 Mo. 658, 675(5), 108 S. W. (2d) 98, 107(11).

There are two answers to this. First, while the evidence as to the cause of the skull fracture was circumstantial, and the conclusion as to the exact cause must be left to inference, yet if appellant would have been responsible in all of the several ways in which substantial evidence shows it may have been inflicted, then it makes no difference in which of those ways the jury might find the fracture was produced,

[2] 11 Words & Phrases (Perm. Ed.), pp. 79, 129, 141; State v. Bowles, 146 Mo. 6, 13, 47 S. W. 892, 893; Wilson v. State, 162 Ark. 494, 258 S. W. 972, 33 A. L. R. 1186, note; Goss v. State, 61 Ga. App. 621, 622, 7 S. E. (2d) 87, 88; People v. Goolsby, 284 Mich. 375, 279 N. W. 867, 868(3).

provided that conclusion accorded with the information and the instruction on second degree murder, of which he was convicted. The jury's verdict is sustainable on that theory in our opinion. The only evidence there is on the question shows the skull fracture was received in some of the ways mentioned, during the course of appellant's assault upon Parker. It may be also that the jury could have found the homicide was justifiable or excusable under the instructions. But they did not, and there was substantial evidence to support the view expressed by the verdict. The Berry case, cited by appellant, is wholly unlike this. There the plaintiff sued for damages for injury to her female organs allegedly sustained in a streetcar collision, and this court held she proved no more than that the injury could have been so caused. The condition of the organs was such that it also might have resulted from other causes for which the defendant would not have been responsible.

■ But here, even on the latter theory the verdict is not unwarranted. The applicable rule, as stated in Guthrie v. St. Charles, 347 Mo. 1175, 1188, 152 S. W. (2d) 91, 97(8), is that where a plaintiff shows a casualty resulted from one of several causes, for only part of which the defendant was responsible, no case is made—unless the evidence also shows a *greater probability* that the proximate cause was one for which the defendant was liable. There was such evidence in this case. Conceding arguendo that the combat in its origin and early stages may have been mutual, and defensive or protective on appellant's part, yet the evidential probability is that Parker did not receive his mortal injury until appellant kicked him into insensibility while he was down.

At that time appellant was not using his hands (with the ring on his finger), but only his feet. Proprietor Glines' wife testified that before the kicking Parker had no marks showing he had been in a fight, and wasn't hurt. Major Bernard said a blow producing the skull fracture would have been so severe that it probably would have produced unconsciousness immediately: or conversely, the fatal trauma immediately preceded the unconsciousness. After the kicking Parker's head was bloody and he was a sickening sight. And as for receiving the skull fracture over the left ear by falling against the automobile truck, Mrs. Glines said Parker fell *backward* against the truck—not sideways; and appellant testified he "fell flatly, or at least he fell."

■ Appellant's third theory is that if the skull fracture and death were not directly caused by the use of his fists and feet, but resulted indirectly from Parker's reeling or staggering from a blow or kick and thereby striking his head against some hard object, then the assault was not committed with appellant's fists and feet, as charged in the information and submitted in the instructions, and there was a failure of proof. The case relied on is State v. Reed, 154 Mo. 122, 134, 55 S. W. 278, 282(6), decided in 1899, where some English decisions

were cited that seemingly sustain appellant's contention. For instance, it is stated one of the English cases held that "where the indictment charged the death by striking and beating on the head, and the evidence was that the prisoner knocked the deceased down by a blow upon the head, and that in falling upon the ground the deceased received a mortal wound . . . the cause of death (pleaded) was not truly stated" in the indictment.

In this case the information was much the same. Quoting substantially without marks, it charged that the appellant with his fists and feet, struck, knocked, hit and beat Parker upon the head and body, thereby giving him one mortal blow, bruise, contusion, fracture of the skull and wound, from which he died the next day. Thus the State limited itself in the information █ to a charge of a single head injury; and there is no mention of Parker's being knocked down by the blow and sustaining the head injury from the fall as an intervening cause. Was that necessary? We think not.

As stated in the fourth preceding paragraph, the probabilities are that the death here was not caused by indirection, but only by appellant's direct kicks after Parker was prostrate. But since that cannot be affirmed as a matter of law, we proceed to examine appellant's theory. The Reed case, supra, was considered in State v. Rizor, 353 Mo. 368, 372(3), 182 S. W. (2d) 525, 527(6), and the fact was noted that it had never been cited since on the point under discussion. We think it is wrong in principle and should be overruled, or limited to special circumstances where its conclusion may properly be applicable. So far as that one point is concerned, a person is criminally responsible for a homicide in whatever manner or by whatever means it was accomplished, provided it was proximately caused by his unlawful act. And the unlawful act need not be the immediate cause of death. It is enough that it be a contributing proximate cause, although other contributing causes may have intervened.[3]

Thus, in State v. Frazier, 339 Mo. 966, 98 S. W. (2d) 707, the defendant struck the deceased a blow in the face, which alone would have been insufficient to cause death. But the deceased was a hemophiliac and bled to death from a laceration caused by the blow; and it was held the defendant was guilty of manslaughter. In the instant case, if it was a part of the appellant's design to assault Parker by knocking him against the wall or pavement, thereby utilizing those objects as instrumentalities, then perhaps the information should have so charged. But if Parker's falling against some hard object (if any) was a mere incident of the criminal act, or if it be unknown whether it was or not, then it was unnecessary to allege it in the information though it may have been a link in the chain of causation.

---

[3] 29 C. J., sec. 54, p. 1077; 40 C. J. S., sec. 11, p. 851; 26 Am Jur., sec. 48, p. 191.

This disposes of appellant's three sub-assignments under this head. All of them are overruled.

■ Appellant's next two assignments of error complain of the trial court's failure adequately to instruct the jury on the defenses of justifiable homicide under Sec. 4379, and excusable or accidental homicide under Sec. 4380. These are basic defenses on which Sec. 4070(4) requires the court to instruct the jury as a part of the law of the case, whether requested or not, if there is substantial evidence to support them. And the failure to do so is reversible error reviewable on appeal if the point was preserved in the motion for new trial.[4] The assignments were preserved in the 41st item of appellant's motion for new trial.

■ Sec. 4379 provides in substance that homicide is justifiable when committed by a person: (1) in resisting the attempted commission of a murder or other felony upon him, or in any dwelling house where he is; (2) or in lawful self-defense, or defense of his near kin, master, apprentice or servant; (3) or in lawfully attempting to apprehend a felon or rioter, or in lawfully suppressing a riot or preserving the peace. The other statute, Sec. 4380, provides homicide shall be deemed excusable when committed by accident or misfortune, in either of the following cases: (1) in correcting a child, etc., or in doing any other lawful act by lawful means with usual and ordinary caution and without unlawful intent; (2) or in heat of passion upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapons being used, and not done in a cruel and unusual manner.

The only instruction given for the State submitting these statutory defenses was instruction No. 2. It covered only manslaughter. Appellant contends the instruction should have made the defenses applicable also to second degree murder, of which he was convicted, or else a separate instruction should have been given covering those issues. The contention is sound. Sec. 4381 makes the defenses of justifiable and excusable homicide equally applicable to murder in the second degree. And the State's instructions must cover them. It was so held in the Crowley and Aitkens cases cited in marginal note 4. The State ■ apparently concedes this. The only answering contention in its brief is that there was no substantial evidence to support such instructions. The assertion is based on the theory that appellant outlawed himself by kicking Parker to death on the head as he lay prostrate on the ground. If that testimony could be accepted as conclusively true, we might agree with the learned Assistant Attorney General. But appellant denied it and otherwise brought himself within several of the provisions of both statutes. In this situation it

---

[4]State v. Burrell, 298 Mo. 672, 678-9. 252 S. W. 709, 711(1); State v. Crowley, 345 Mo. 1177. 1182(1), 139 S. W. (2d) 473, 475(1); State v. Aitkens, 352 Mo. 746, 762, 179 S. W. (2d) 84, 94(24).

cannot be denied that he was entitled to instructions on justifiable and excusable homicide as against second degree murder, insofar as his testimony tendered an issue thereon. A case in point is State. v. Coff, 267 Mo. 14, 21, 183 S. W. 287, 289(2).

█ Appellant further challenges instruction No. 2 as to form. Although it dealt only with manslaughter and he was not convicted of that crime but of the greater crime of murder, his view apparently is that if the instruction had been properly drawn he would have been convicted only of the lesser crime, if any. The instruction defined manslaughter as any homicide "not herein declared to be murder in the second degree or excusable or justifiable homicide . . ." Then it submitted the question whether appellant killed the deceased without malice and premeditation, and in such circumstances that it was not justifiable or excusable homicide, and not in the lawful defense of his person. Justifiable homicide was defined as "the killing of another in the lawful defense of one's person." Excusable homicide was said to mean "the accidental killing of another." The instruction closely follows one given in State v. Gadwood, 342 Mo. 466, 494-6 (VIII), 116 S. W. (2d) 42, 58(VIII) and several earlier cases.

As will be seen the instruction limited justifiable homicide to a killing in self-defense, whereas Sec. 4379 makes it include other killings—as in resisting the commission of a felony upon one's self or in the dwelling where one is, and preserving the peace. Appellant complains because these hypotheses were omitted from the instruction, and says there was evidence to support them. The State denies there was such evidence, pointing to one testimonial statement by appellant, "I had to defend myself," and to the fact that the only instructions asked in his behalf on this point did not go beyond self-defense. On the other hand the appellant refers to testimony that he was summoned by "Pop" Glines to quell the disturbance and protect the Ackerman woman when Parker was making advances to her and slapped "Pop"; that he asked Parker not to make trouble, and told him the place was out of bounds for soldiers; and protested against fighting because of his fractured arm; but that Parker nevertheless started the fight and kept it going. We think this was sufficient evidence to call for the inclusion of the preservation of the peace element, at least, in the definition of justifiable homicide. The point was preserved in the 41st item of the motion for new trial, and it was the duty of the court to instruct on it under Sec. 4070(4). The assignment is sustained.

█ Citing the Gadwood case, supra, 342 Mo. l. c. 494(8), 116 S. W. (2d) l. c. 58(23), appellant charges that said instruction No. 2 was further erroneous, and contradictory, in authorizing the jury to convict him of manslaughter for "intentionally" killing Parker "without malice." The instruction in the Gadwood case defining malice said it was "such state of mind as one is in who intentionally does an unlawful

act." So the appellant there made this query—as does appellant here: how can one *intentionally* kill *without* malice, when, under the above definition, the intentional doing of the unlawful homicidal act itself would be malicious?

The opinion in the Gadwood case, of which this writer was the author, lacked clarity and missed the point in answering that contention. The fact is that the above quoted definition of malice in the Gadwood instruction was incomplete, in that it failed to state the homicidal act must not only be intentional and unlawful but must also be done *without just cause or excuse* (such as heat of passion on adequate provocation). That omission was overlooked, as is obvious since malice was correctly defined elsewhere in the opinion; and it was stated that when one kills in heat of passion based on adequate provocation the malice is submerged or purged. There was therefore no contradiction, and the same is true in this case because malice is correctly defined in instruction No. 1 here. The assignment is overruled.

 Closely associated with this last assignment is appellant's next contention: that the trial court erred in failing to submit the manslaughter issue specifically on heat of passion engendered by lawful provocation, and to define those expressions, either in said instruction No. 2 or some other instruction. As will be remembered, instruction No. 2 defined manslaughter practically in the language of Sec. 4382, by telling what it is not, thus: any homicide not constituting murder or excusable or justifiable homicide. Then it defined justifiable homicide as the accidental killing of another. Such instructions have been given ever since the decision in 1922 of State v. Gore, 292 Mo. 173, 187, 237 S. W. 993, 997. But appellant says the Gore case has been overruled, in effect, by the Gadwood case, supra, and State v. Robinson, 353 Mo. 934, 185 S. W. (2d) 636. The Robinson case does not pass on the form of the instructions. It is not in point.

But the Gadwood case did say there is some ground for contending an instruction on manslaughter "should include the facts (constituting the just cause or excuse) which eliminates the malice . . ." That statement was inept, since the "excuse" that will blot out malice and reduce a felonious homicide from murder to manslaughter is not the same as the "excusability" under Secs. 4380 and 4381 which forgives the killing altogether—and it was this latter kind of excusable homicide to which the Gadwood instruction and the one in this case referred. A defendant may kill in hot blood under sufficient provocation, even with a deadly weapon, and the crime will only be manslaughter. State v. Reed, supra, 154 Mo. l. c. 131, 55 S. W. l. c. 281. But not so of homicide by accident or misfortune. To the latter are annexed the conditions and specifications enumerated in Sec. 4380. The defendant must be doing some lawful act by lawful means, with

usual and ordinary caution, and without unlawful intent; or must act in heat of passion, upon sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not in a cruel and unusual manner.[5]

So the foregoing statement in the Gadwood case is not so far wrong, in principle. The rules sanctioned by the decisions are as follows. As held in the Gore case, supra, the crime of manslaughter may be defined by an instruction substantially in the language of Sec. 4382. But that involves the use of the term "excusable homicide." Another statute, Sec. 4380, gives it a special or technical meaning: it is a homicide committed "by accident or misfortune," and then only in specified instances. The cases[6] say the instruction ought to define the term in accordance with these limitations, or that it would be "more accurate" to do so. But they further hold that where, as here, excusable homicide is defined merely as an "accidental" "unintentional" killing, without more, the error if any is in defendant's favor, and he cannot complain. It follows that this assignment should be overruled.

 We shall consider only one more of the 78 assignments and sub-assignments of error in appellant's brief. The same point was urged by the same counsel in State v. Brinkley, 354 Mo. 337, 373-4(25), 189 S. W. (2d) 314, 334(47). We did not pass on it then but do so now. In prosecuting appellant in this case under the habitual criminal statute, Sec. 4854, the State alleged and proved: that he had previously been convicted on September 21, 1942 of the crime of larceny from the person of an amount less than $30 (a felony under Secs. 4460 and 4864) and sentenced to the St. Louis City Workhouse for five months; that he was paroled by the court on November 25, 1942; and was still out on that parole when he committed the instant homicide on September 12, 1943. [See Sec's. 4199-4207; and In re Mounce, 307 Mo. 40, 269 S. W. 385.]

Under the habitual criminal statute, supra, an aggravated punishment is imposed on a second offender who, after the commission of a penitentiary offense, "shall be discharged, either upon pardon or upon compliance with the sentence, and shall subsequently be convicted of any (penitentiary) offense committed after such pardon or discharge." The appellant contends his aforesaid conditional parole on the prior larceny conviction was neither a pardon nor a discharge nor a compliance with the sentence thereon, within the meaning of Sec. 4854; and that the habitual criminal statute therefore is not

---

[5]30 C. J., sec. 268, 269, pp. 87-88; 40 C. J. S., sec. 112, pp. 978-81; 26 Am. Jur., sec. 106, p. 229, sec. 220, p. 305.

[6]State v. Farrell, 320 Mo. 319, 326, 6 S. W. (2d) 857, 860(8); State v. Ryland, 324 Mo. 714, 720, 25 S. W. (2d) 109, 112(5, 6); State v. Frazier, 339 Mo. 966, 978(10), 98 S. W. (2d) 707, 714(15); State v. Aitkens, 352 Mo. 746, 758, 760-1(6), 179 S. W. (2d) 84, 91, 93(19).

applicable to the instant prosecution for the commission of a subsequent crime while the foregoing parole was in force. The case cited. is State v. Hefflin, 338 Mo. 236, 241, 89 S. W. (2d) 938, 941(1). The State maintains the contrary, citing State v. Asher, 246 S. W. 911, 913; State v. Murphy, 345 Mo. 358, 360(3), 133 S. W. (2d) 398, 399(2); State v. Donnell, 353 Mo. 878, 184 S. W. (2d) 1008, 1010(5).

These three cases do support the State's contention. But all are based on the theory that a parole is a "conditional pardon," as first held in the Asher case. That holding itself really was obiter dictum, because the opinion, 246 S. W. l. c. 913, 914, declared the defendant's own testimony showed he had received an *un*conditional pardon from the Governor before he committed the offense for which he was on trial. But even if the conditional pardon theory of the Asher case were correct it would have no application here, for the parole in that case had been granted by the Governor and the decision went on the theory that his power to parole was included in his constitutional power to pardon under the 1875 Constitution. [Sec. 7, Art. IV of the Constitution of 1945 provides the power to pardon shall not include the power to parole.] But the courts do not have the pardoning power; and the parole in the instant case was judicial and statutory. Ex. parte Thornberry, 300 Mo. 661, 671-2, 254 S. W. 1087, 1090(11); Lime v. Blagg, 345 Mo. 1, 6, 131 S. W. (2d) 583, 586(10).

Furthermore, by the great weight of authority a parole is not a conditional pardon. Out of 47 judicial definitions of "parole" in 31 Words & Phrases (Perm. Ed.), p. 102, only six [these including the Asher and Murphy cases from this state], say a parole is a conditional pardon. It is rather a conditional release of the prisoner from confinement having as its objective his rehabilitation, and operating much as if an indeterminate sentence had been imposed in the first place. The prisoner is conditionally released from physical custody, but his conviction and sentence remain in force and he continues in constructive custody.[7]

That being true, this appellant's release on parole from the prior larceny conviction was not a *discharge*. The language of Sec. 4854 is that the prisoner must be "discharged either upon pardon or upon compliance with the sentence." Numerous cases hold the discharge must stand on one or the other of these two bases; and both a pardon and a compliance with the sentence operate as a complete acquittance. The fundamental effect and very essence of a true pardon is forgiveness or remission of the punishment.[8] And both the Austin and Christup cases, supra, agree that the "compliance" provision

[7] 46 C. J., sec. 76, p. 1208: 39 Am. Jur., sec. 91. p. 577; Herring v. Scott, 142 S. W. (2d) 670, 671-2; Ex parte Habrich, 343 Mo. 196, 197, 120 S. W. (2d) 42, 43(2); State v. Jennings. 278 Mo. 544. 551(I), 213 S. W. 421, 422(1).
[8] 31 Words & Phrases (Perm. Ed.). pp. 68-72; State v. Jacobson, 348 Mo. 258, 261, 152 S. W. (2d) 1061, 1063(1), 138 A. L. R. 1154.

of our statute means the same as a former New York statute which provided the prisoner must have been discharged "upon the *expiration* of his (former) sentence," citing Wood v. People, 53 N. Y. 511, decided in 1873. So, likewise, 16 C. J., sec. 3152, p. 1341, note 71, cites Commonwealth v. Mott, 38 Mass. 492, 498, decided in 1839, which held the *discharge* of the prisoner could not be by escape, but must be "by pardon or otherwise."

A parole could not operate as an acquittance because the prisoner could not have rendered complete "compliance" with the sentence as long as the parole was outstanding and not fully satisfied. Indeed, the very commission of the subsequent crime itself would be a violation of the condition in the parole on the previous crime requiring the parolee to obey the law, so that neither the parole nor the sentence on that crime would have been complied with. A few cases cited in 24 C. J. S., sec. 1960, g, h, p. 1154, may seem at variance with the views expressed here; but that is because the statutes in those jurisdictions differ from ours. Thus, one in Connecticut provides the punishment shall be enhanced for a defendant who has "twice before been convicted, sentenced and *imprisoned* . . ." And State v. Mead, 130 Conn. 106, 109-110, 32 Atl. (2d) 273, 275(2), recently decided by the highest court of that state, holds the word "imprisoned" in the statute does not import *completion* of the prior sentences; and that an escapee would be amenable thereto. But in so ruling the decision noted the difference between that statute and ours, which latter, it said, "expressly" requires that the defendant be "discharged" on the prior sentence by pardon or compliance therewith;—then citing the ruling in our Christup case, supra,[9] that our statute does *not* cover escapees.

Several of our decisions have speculated on the reasons underlying the requirement in our statute that a second offender must have been discharged from the prior sentence either by pardon or compliance therewith. The Austin, Asher and Sumpter cases[9] recognize the reasoning of the Wood case from New York, cited in the third preceding paragraph, which held that until the prior sentence had been fully discharged by pardon or expiration, there always would be the possibility that it might be adjudged void ab initio, as by habeas corpus or other writ, in which event the prisoner would be cleared as second offender after he had already been subjected to punishment as such.

As regards the application of our habitual criminal act to paroles on prior penitentiary sentences, it should be remembered our statutes are 111 years old, and like the former New York and Massachusetts

[9]State v. Austin, 113 Mo. 538, 542, 21 S. W. 31, 32; State v. Asher, supra, 246 S. W. 911, 913; State v. Schneider, 325 Mo. 486, 491, 29 S. W. (2d) 698, 699; State v. Sumpter, 335 Mo. 620, 622(1), 73 S. W. (2d) 760; State v. Christup, 337 Mo. 776, 779, 85 S. W. (2d) 1024; State v. Jones, 339 Mo. 893, 895(2), 98 S. W. (2d) 586.

statutes considered in the Wood and Mott cases, supra. In these respects they stand exactly as when first enacted by R. S. Mo. 1835, sec. 7, p. 212. And our first circuit court parole act was not passed until over 60 years later in 1897. Our first Board of Pardons and Paroles for state prisons was created by Laws Mo. 1913, p. 227. Prior to those acts the only power to ameliorate sentences was the Governor's pardoning power. The habitual criminal statutes were enacted at a time when there were no paroles. So they were simply made applicable to second offenders who had either been pardoned on the prior conviction and sentence or had served it out. In many other states statutes of this nature have been revised in recent years.

If our habitual criminal statutes be construed as applying to parolees, then one out on parole from a life sentence, who commits a second offense the maximum punishment for which is life imprisonment, would necessarily be subjected to two life sentences. And in any second offender felony case the defendant's parole on his first offense could be revoked [Silvey v. Kaiser, Warden (Mo. banc), 173 S. W. (2d) 63, 64(1)] and he could be put back in the penitentiary and be serving out the rest of his first sentence at the very time he was put on trial under the habitual criminal act for his second offense, on the false theory that he was a "discharged" convict who had either been *pardoned* or had *complied* with his first sentence in full. Yet that same harsh rule could not be enforced against a worse man— a prison inmate who had never been deemed worthy of a parole—if he should commit exactly the same second offense.

For errors in the failure to instruct on the defenses of justifiable and excusable homicide, as against the crime of second degree murder of which appellant was convicted; and for limitation of the defense of justifiable homicide to self-defense, in the State's instruction No. 2; and erroneous submission of the cause to the jury by instruction No. 4 under the habitual criminal act, as based on appellant's prior conviction of the crime of larceny from the person in St. Louis, the cause is reversed and remanded. Because of the length to which the opinion would be extended, we are not passing on the many other assignments of error. The failure to do so is not to be taken as a ruling thereon either way.

Reversed and remanded.

*Tipton, J.,* concurs; *Leedy, J.,* concurs in the result and in all except what is said on appellant's last assignment about his conviction under the habitual criminal statute.