THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.* CHARLES TILO, *alias* FRANMACHÚ, Defendant and Appellant.

No. 11725. Argued June 3, 1947.—Decided June 24, 1947.

*Vicente Palés Matos* for appellant. *Luis Negrón Fernández, Attorney General,* and *Joaquín Correa Suárez, Prosecuting Attorney,* for appellee.

Mr. Justice De Jesús delivered the opinion of the Court.

On the night of January 6, 1945, Oscar Cintrón was in a bar owned by defendant in Mayagüez. Cintrón was operating a juke box in the establishment at the time that the defendant was furnishing certain information to policeman David Jiménez in connection with an investigation which the latter was making. Since the noise coming from the juke box annoyed defendant and the policeman, Cintrón was asked to stop playing the juke box. The latter then asked the defendant to reimburse him a dime which he had put in the juke box, whereupon the defendant gave him a quarter. This action of the defendant did not quiet Cintrón, but instead he climbed on a table and began to provoke him giving rise

to a discussion between them. Then Cintrón came down from the table and slapped the defendant. Immediately they engaged in a fist fight. Before the policeman could intervene, the defendant, who was carrying a revolver concealed in his clothes, fired a shot as a result of which Cintrón received a wound in the right parietal region and fell to the floor. The defendant immediately handed the weapon to the policeman. The wounded man was taken to the hospital where he was treated by Dr. Arrarás until his death on February 2, following.

Dr. Arrarás performed the autopsy and stated that the death had been the result of meningitis produced by the irritation caused in the encephalic mass due to the pressure of the fractured bone. He testified that the wound was not necessarily mortal; that when he realized that the patient showed symptoms of meningitis, after consulting another physician, he advised Cintrón, who was conscious, that in order to avoid the pressure, he should undergo an operation and warned him that it was his only opportunity to save his life. The patient answered that he would rather die than submit to an operation.

The sole essential variance between the evidence of the prosecuting attorney and appellant's consists in that, according to the latter, when the deceased and the defendant began to fight, the former seized the revolver carried by the defendant and in the struggle for the possession of the weapon, a shot was fired.

The jury settled the conflict of the evidence against the defendant and rendered a verdict of voluntary manslaughter, but recommended mercy in the imposition of the penalty. The defendant timely moved for a new trial which was denied and the court imposed on him a sentence of two years' imprisonment at hard labor. From this sentence and from the refusal to grant a new trial, the defendant has taken the present appeal.

■■ The first assignment of error consists in that the court refused to direct a verdict of acquittal. This assignment of error is predicated upon the fact that since the wound was not necessarily mortal and the wounded person refused to be .operated on, the proximate cause of the death is not the wound but the illness which ensued for failure to submit to the operation.

The question raised by the defendant leads us to determine whether the fact that the victim refused to undergo the operation relieves the defendant from liability for the offense charged. The question raised in this case is not novel in this jurisdiction. In *People* v. *Rodríguez,* 39 P.R.R. 840 and *People* v. *Nieves,* 40 P.R.R. 367 wherein the defendants were convicted of manslaughter, it was decided that when death follows the injury without other independent intervening cause calculated to produce death, had decedent not been injured by defendant's wrongful act, all evidence tending to show lack of adequate treatment should be excluded.

This decision should be sufficient to dispose of the first assignment of error, but, subsequently, in *People* v. *Pérez,* 61 P.R.R. 456, notwithstanding the fact that the two aforesaid cases are cited with approval, there was an *obiter dictum* making the position of this Court rather uncertain as to the point raised herein, and in order to dispel any doubt, we must now consider the question more fully. In the *Pérez* case, *supra,* appellant was sentenced for the crime of mayhem consisting of having attacked Asunción Morales with a whip, striking him over the left eye as a consequence of which Morales lost his vision in that eye. The only error assigned consisted in the court having charged among other things, "that if a person inflicts a wound on another and the wounded person does not receive adequate medical treatment or does not submit himself to adequate medical treatment, that does not exempt the person who inflicted the wound from criminal responsibility."

This Court, after stating that "we are not in condition to decide whether or not the instruction is correct because we are not acquainted with the testimony introduced in the trial court which necessarily served as a basis for the instructions given", in the course of its opinion, said:

"If the accused introduced evidence tending to show that the sole and proximate cause of the loss of vision in the left eye of the deceased, was the refusal of the latter to submit himself to medical treatment, we would have to decide that the instruction was prejudicial to the rights of the accused, because if that testimony was introduced and the jury gave credit to it, the accused might have been convicted of aggravated assault and battery and not of mayhem."

The refusal or resistance to surgical treatment could not have been the sole and proximate cause of the loss of vision. This is so, because if the need of treatment was due to the unlawful act of the defendant, such act was the original cause and the lack of treatment was a further cause of the loss of vision. In other words, the lack of medical treatment can never be the sole proximate cause, when the injury received was one which called for such treatment, for had the deceased not been injured, there would have been no need for such treatment. The injury unlawfully inflicted by the defendant was at all times an element which contributed to the loss of the vision and for this reason the defendant in that case was guilty of the crime of mayhem, even if the wounded person had refused medical treatment. Focht, Jr., Proximate Cause in Homicide, (1938) 12 So. Calif. L. Rev. 17, 35; *State* v. *Brinkley*, 193 S. W. 2d 49 (Mo. 1946.); *Tucker* v. *Commonwealth*, 199 S.W. 2d 631 (Ky. 1947).

The question raised by appellant has had for a considerable period the attention of the courts and text writers on Criminal Law. *Kelley* v. *The State*, 53 Ind. 311 (1876); Causal Relation Between Defendant's Unlawful Act and the Death, (1933) 31 Mich. L. Rev. 659; Clark & Marshal, Law of Crimes, (2d. ed. 1905) 322; 1 Wharton, Criminal Law,

468

(12th ed. 1935) 265, note 19; Notes (1908) 22 L.R.A. (N.S.) 841–845.[1] In England there is a long series of cases dealing with this matter and those we have been able to find[2] uniformly hold that if the wound inflicted is the proximate cause of the death, the fact that the wounded person refuses or neglects the cure, does not relieve the defendant from liability for the offense. Among the English cases there is *Reg.* v. *Holland,* (1843) 2 Moody & R., (Engl.) 357, which is summarized in a note in 1 Wharton Criminal Law, *supra,* page 265, as follows:

". . . The deceased had been severely cut with an iron instrument across one of his fingers, and had refused to have it amputated, and at the end of a fortnight lockjaw came on, and the finger was then amputated, but too late, and the lockjaw ultimately caused death. The surgeon expressed the opinion that early amputation would probably have saved his life. Maule, J., held that a party inflicting a wound which ultimately becomes the cause of death is guilty of murder, though life might have been preserved if the deceased had not refused relief."

The reason for this rule is set forth by the Supreme Court of Massachusetts, through Chief Justice Bigelow, in *Commonwealth* v. *Hackett,* 84 Mass. 136 (1861):

"A different doctrine would tend to give immunity to crime, and to take away from human life a salutary and essential safeguard. Amid the conflicting theories of medical men, and the uncertainties attendant on the treatment of bodily ailments and injuries, it would be easy in many cases of homicide to raise a doubt as to the immediate cause of death, and thereby to open a wide door by which persons guilty of the highest crime might escape conviction and punishment."

Since the first assignment of error does not exist, we shall now pass to consider the second. It consists in having denied the motion for mistrial presented by the defense. The

---

[1] The district attorney cites in his brief a Texas case to which we make no reference because although it applies the same doctrine, it is based on a statute of said State and not on general principles of the Common Law.

[2] *Mikell, Cases on Criminal Law* (3rd. ed. 1933), 144 *et seq.*

motion for mistrial was based on the fact that one of the
jurors, Pablo Ramos, was hard of hearing and consequently
was incapacitated to act as such. The defendant, despite
the fact that he had examined juror Ramos as to his capacity
to act as such, did not challenge him for cause or peremp-
torily as he could have done if in point of fact he believed
that the juror was physically incapacitated.[3] On different
occasions during the course of the trial, counsel for the de-
fendant asked him if he could hear well and the juror always
replied affirmatively without it being revealed by his an-
swers whether he had any defect in hearing. It is true that
when the defendant took the witness stand and said that his
name was "Charles Tilo, known as Fernando Franmachú,"
counsel for the defendant addressed the juror in question and
asked him: "Did you hear that, don Pablo?" and the juror
answered: "Yes, Felíu." The fact that the juror did not
understand defendant's nickname does not show that he was
deaf. In ordinary conversation occasionally one does not
catch a word, especially names, and its repetition is asked.
Because of that fact alone we do not think that the person
who did not hear is deaf. Furthermore, counsel for defend-
ant examined him as to his capacity to act as juror. From
that moment he suspected he did not hear well. Neverthe-
less, he did not challenge him either for cause or peremp-
torily nor did he choose to file a motion for mistrial until

[3] In the examination made by the defense to prove the capacity of this
juror to act as such, the following appears:

"Q. What is your name?—A. Pablo Ramos.—Q. How old are you?—A.
Well, I am sixty-nine years old.—Q. Sixty-nine, don Pablo?

Can you hear well?—A. Yes, I can.—Q. Why do you make such faces
when you answer as if you did not hear well? The question is whether you can
hear well.—A. Yes, I hear well.—Q. Is your hearing alright?—A. At times
I feel my ear blocked.—Q. That must be earwax. But as a rule, do you hear
alright the way you and I are talking now, don Pablo?—A. Yes, sir.—Q.
Where do you come from, don Pablo?—A. From Montoso.—Q. From Maricao?
—A. No, from here, from Mayagüez.—Q. Then, it is not bounded by Ma-
ricao?—A. No, Montoso of Mayagüez. There is a Montoso in Maricao and a
Montoso in Mayagüez. I am from Mayagüez."

470

after all the evidence had been introduced, even that for rebuttal.

The trial court did not err in denying the motion for mistrial.

The third and fourth assignments of error deal respectively with the denial of a new trial and with the contention that the verdict is contrary to the evidence. The motion for a new trial was founded on the first two errors which we have just discussed. As to the contention that the verdict is not supported by the evidence, we have already said that the evidence was contradictory, and that the jury settled the conflict against the defendant, and it does not appear that in so doing it acted with passion, prejudice or partiality or that it committed manifest error in weighing the evidence.

The judgment below is affirmed.