STATE OF MISSOURI, Respondent, v. WILLIE WHITED, Appellant, No. 41906—231 S. W. (2d) 618.

Division One, July 10, 1950.

*Parke M. Banta* and *Edgar & Banta* for appellant.

*J. E. Taylor*, Attorney General, and *John S. Phillips*, Assistant Attorney General, for respondent.

LOZIER, C.—Appellant (hereinafter called defendant) was convicted of second degree murder and sentenced to 10 years imprisonment. In this appeal, he challenges the sufficiency of the evidence to support the verdict and contends that 4 instructions were erroneous.

Defendant shot and killed Harold Whiffen in a cafe near Ironton, August 2, 1948. The two had never met before. Defendant was 29 years old, 5 feet, 4 inches high and weighed about 120 pounds. He was wounded in action during the war and still suffered the effects, especially in one leg. Deceased was "a young fellow, well-developed, of good build, pretty much of a man, weighed about 175 lbs., and was 5-9 or 5-10 in height."

Defendant, his wife, Racer and Hardwick went to the cafe that evening and sat down at a table adjoining the one at which deceased and three friends were sitting. Defendant knew no one in the place other than those at his table. Later, Lee Moore and his wife, both of whom defendant knew, came in and sat at another adjoining table. The persons in these two groups "visited back and forth." No one in either group had any conversation with any one at deceased's table. The seats at the other tables and at the lunch counter were filled with customers drinking beer and eating.

It was the night before the primary election and a candidate was "putting out free barbecue." The place was noisy. Suddenly, some one said, "son of a bitch," in a tone loud enough to be heard by most of the guests at this political feast. One of the state's witnesses said that defendant called out the name, but there was no evidence that, if he did, it was directed toward deceased. Deceased asked defendant if he had called him that name. Defendant denied this. Further words passed. Then, according to the state, the two "jumped up, met in the middle of the floor and started fighting." (According to the defendant's witnesses, deceased came to defendant's table, told him to stand up, and pulled him out of the chair.) Defendant did not strike a blow. Deceased knocked him down, straddled him, struck him in the face, banged his head against the floor, and gave defendant a terrific "beating up."

The proprietor came out of the kitchen and said, "Boys, I can't have this here. Get up." Defendant's wife took hold of deceased's shoulder and begged him to let defendant up, saying that defendant

"was wounded in his leg and can't fight you." Deceased released defendant, backed toward the door and stood facing defendant. Defendant arose, pulled a pistol from his pocket and pointed it at deceased. Deceased turned and ran through the door. Defendant fired, the bullet struck deceased in the back of the head and he fell off the porch dead.

The front of the cafe was narrow (14 feet). Due to the arrangement of 4 tables, 16 chairs, a "juke box," a showcase and a lunch counter (with stools in front of it), the battery upon defendant was committed within an open area of approximately 12 feet by 5 or 6 feet in size. When deceased got up and stood facing defendant he was 3 or 4 feet from the door.

The state's evidence was that, after deceased got up, he stood with his back to the door and his hands at his side, looking at defendant; that when he saw defendant pointing the gun, he turned and ran through the door; that he was in the doorway or on the porch when shot; that when defendant got up he backed a few steps, pulled out the pistol, "clicked" a shell into the chamber and pointed the gun; that defendant's wife grabbed his arm and shouted, "Don't do it." Defendant's witnesses testified that when deceased got up he stood with his fists clinched and "looking awful mad"; and that defendant had difficulty in getting up. Between 5 and 10 seconds elapsed between the time deceased got up, and fired the shot.

After the shooting defendant walked, or was led by his wife, through the door. Deceased was lying face down on the ground, his feet upon the porch steps. Defendant turned the body over and said, "Get up, I didn't mean to hurt you."

Defendant's wife stated that she led defendant to the car; that he "didn't have his right mind"; that they first went to her sister's home where he "lunged through the screen door"; that he didn't appear to know what he was doing (in a deposition she had stated defendant was not too drunk to know what he was doing), or that he had shot a man; that he washed up at her sister's home. She denied that defendant stated, "I have shot one man tonight and I am going to get another."

Defendant's wife's sister testified that while washing up, defendant said nothing; that he then asked his wife to "get the 22," adding, "I always told you no s. o. b. would ever beat me up like they did Ed and get away with it"; that before they left her house he said, "I got one s. o. b. tonight and there are two more down at the end of the field I am going to get before they get me"; and that defendant acted like he was drunk and didn't seem to know what he was doing. The sheriff testified that when he arrested defendant that night defendant was dead drunk and talked to no one.

Defendant accounted for the presence of the pistol in his car by his plans (changed by Hardwick's insistence that the 4 go to the

free barbecue) for going fishing. He was corroborated in this by his wife and Hardwick. There was no explanation of why he had the pistol in his pocket at the cafe. He testified that he had been drinking that afternoon, but that he was not drunk; that he remembered talking to the Moores, but had no recollection of anything that happened thereafter except hearing a shot, standing in the middle of the floor with blood all over him, going to the door and seeing deceased lying outside and "not knowing whether he had done it or not," then "blacking out" again and "coming to" the next morning. He recounted an instance of "blacking out" while in military service overseas.

Dr. E. F. Hoctor, Superintendent of State Hospital No. 4, Farmington, eminent psychiatrist, heard defendant testify. Basing his opinions upon such testimony and upon hypothetical questions, Dr. Hoctor stated that the "black-out" claimed by defendant could have been possible; that it could have been caused by the beating or by drinking; that in such condition, the subject would not be conscious of what he was doing, and would "instinctively react for self-preservation"; that he might have had "amnesia from trauma"; and that such an intermittent black-out was not as ordinary as a sustained black-out. The testimony as to defendant's actions after the shooting tended both to corroborate and to refute defendant's "black-out" theory.

[1] Defendant's first assignment is that the evidence was insufficient to support the verdict of second degree murder; that the killing, having been done in heat of passion, was without malice and, hence, was manslaughter; and that there was no evidence from which malice could properly be presumed. Defendant's position is sound and we sustain the assignment.

"Malice is an essential ingredient of murder." State v. Foster, 355 Mo. 577, 197 S. W. 2d 313. And malice and second degree murder are presumed from proof of an intentional killing with a deadly weapon. Ex parte Johnson (Mo. Sup.), 280 S. W. 702; State v. Richmond, 321 Mo. 662, 12 S. W. 2d 34; State v. Larkin and Harris, 250 Mo. 218, 157 S. W. 600; and State v. Kyles, 247 Mo. 640, 153 S. W. 1047. However, this proof is only prima facie evidence of malice. "The ordinary result of the use of" a deadly weapon "raises a presumption of malice and shifts the burden of proof to repel the inference of same to the accused, *unless the evidence proving the killing shows its absence.*" (Italics ours.) State v. Stewart, 278 Mo. 177, 212 S. W. 853. Here the uncontradicted evidence of a killing in heat of passion shows the absence of malice and destroys the presumption. See 40 C. J. S. p. 1101, and cases cited.

"A defendant may kill in hot blood under sufficient provocation, even with a deadly weapon and the crime will only be manslaughter." State v. Brinkley, 354 Mo. 1051, 193 S. W. 2d 49. Proof of the

assault and battery here "warrants an inference that heat of passion was engendered thereby." State v. Littlejohn, 356 Mo. 1052, 204 S. W. 2d 750; and State v. Stallings, 326 Mo. 1037, 33 S. W. 2d 914. In State v. Connor (Mo. Sup.), 252 S. W. 713, this court considered a number of cases involving the negation of malice where the killing was claimed to have been done in heat of passion. In State v. Robinson, 353 Mo. 934, 185 S. W. 2d 636, we analyzed cases involving heat of passion and cooling period and concluded: that each case must be determined upon its own facts; and that "when the cooling period is very long or very short the court may hold as a matter of law that it was sufficient in the one case and insufficient in the other. Where it is between these (two) limits the test is reasonableness under the evidence and the question usually, but not always, is for the jury."

The circumstances in the pending case completely negative malice. Defendant and deceased were unacquainted, neither knew who the other was and they had not previously spoken to each other. Both had been drinking beer at the cafe. A "barroom brawl" developed in which deceased knocked defendant down and beat him violently, and immediately (within 10 seconds or less from the time defendant got up and while deceased was standing 6 or 8 feet away) defendant pulled a pistol and fired the fatal shot. Heat of passion existed as a matter of law; there was no cooling period whatsoever; the presumption of malice (arising from the use of a deadly weapon) was destroyed and there were no other circumstances from which malice could be implied. We hold that, as a matter of law, the evidence was insufficient to sustain the verdict of second degree murder.

This ruling is limited to this case. It is not to be understood to apply to every case where the killing is done in heat of passion as a result of battery. Nor do we hold that in every such case malice is negatived and that the issue of second degree murder should not be submitted to the jury. (For example, see State v. Stewart, supra, where "bad blood" existed prior to the killing.) As we said in State v. Foster, supra, each case must stand upon its own particular facts.

Defendant next complains of Instruction No. 1 which defined excusable homicide as "the accidental killing of another." While this definition would have been "more accurate" if it had defined excusable homicide in accordance with the applicable limitations of the statute (Sec. 4380, both Mo. R. S. 1939 and Mo. R. S. A.), the error, if any, was in defendant's favor. State v. Brinkley, supra. This assignment is overruled.

In view of the conclusion hereinbefore reached, defendant's assignments of error as to Instruction No. 2, relating to second degree murder, need not be ruled on.

962

Defendant's next assignment relates to Instruction No. 3, the manslaughter instruction. He first points out that this instruction required a finding only that defendant "made an assault upon" deceased; not that defendant "shot" deceased. Without deciding this point, we suggest that upon a retrial the manslaughter instruction be written in conformity with the views expressed in State v. Harp, 306 Mo. 428, 267 S. W. 845, cited by defendant. See also 2 Raymond, Mo. Inst. Juries, Ch. 83(D).

Defendant's other objection to Instruction No. 3 is that it did not sufficiently distinguish manslaughter from second degree murder, and did not define heat of passion, adequate cause or provocation, and cooling time. The assignment is without merit. State v. Brinkley, supra.

Defendant's last assignment (that Instruction No. 4 relating to voluntary drunkenness is an improper and unfair comment on the evidence) is likewise without merit.

The judgment is reversed and the case remanded. *Van Osdol* and *Aschemeyer, CC.*, concur.

PER CURIAM:—The foregoing opinion by LOZIER, C., is adopted as the opinion of the court. All the judges concur.