THE STATE v. LEROY J. CROWLEY, Appellant.—139 S. W. (2d) 473.

Division Two, May 4, 1940.

*Howard Elliott* and *Royal L. Coburn* for appellant.

*Roy McKittrick*, Attorney General, and *Max Wasserman*, Assistant Attorney General, for respondent.

LEEDY, J.—Charged by information in the Circuit Court of St. Louis County with murder in the first degree, in having shot and killed one John Currie on September 26, 1934, appellant was convicted under said information of murder in the second degree. The jury assessed his punishment at ten years' imprisonment in the

state penitentiary, and, after an unavailing motion for a new trial, he appealed.

Appellant and his partner, Joseph L. Butz, owned and operated a tavern in St. Louis County, and it was in their place that the shooting of Currie, the deceased, occurred. Appellant was 35 years of age, and the deceased was 24. Currie arrived at the tavern early in the afternoon on the day in question. He loitered about the place, watching a card game and drinking beer, for several hours before the shooting which took place about 4 p. m. At the time of the shooting and for several hours prior thereto, there were seven or eight customers or frequenters in the place—mostly younger men, practically all of whom were acquainted with each other, and with appellant and deceased. Four or five of them were at a table near the bar playing a game of cards; others were playing a pin-ball machine, eating sandwiches, drinking beer, etc. Seven of them testified as witnesses for the State, and one on the part of appellant.

The State's evidence was to the effect that while Currie was seated peaceably at the bar drinking a glass of beer, appellant suddenly came from behind the bar, approached Currie from the rear, and without any demonstration or warning of any kind, hit him in the jaw, knocking him off the stool, and to the floor; that when Currie attempted to get up, appellant said, ''Tell me the other two fellows that was with you;'' that he hit him again, and knocked him down the second time; that one of the customers, Earl Moeller, who was in the card game, grabbed appellant, and took him toward the south wall, and another witness, Halveland, who was also in the card game, said, ''This is your place of business, use your head,'' or words to that effect; that one McCrea, another of the card players, said to appellant, ''Why don't you wait until he is sober before you hit him?'' To which appellant replied, ''I'll give you some of it, too,'' or words to that effect; that when Currie did get up, he staggered over toward the south wall, and appellant, who in the meantime had been turned loose, got behind the card table, and pulled out a gun and shot Currie, and the latter fell. When he did so, a chair was knocked against Crowley, who also fell. The above facts as to the drawing and discharging of the gun were testified to directly by four witnesses. Three others were not looking at the precise moment that the gun was fired, but each of them saw it in appellant's hands immediately after Currie was shot and one of the three was positive in testifying that the shooting took place before appellant fell. There was testimony to the effect that the only blows struck were those delivered by appellant, and that no one was attempting to attack him. The deceased was not armed. His death was caused by a bullet wound through the chest. After the shooting those in the place, including appellant, ran to the street. Appellant was brandishing his revolver, which he

pointed at McCrea, who had run across the street. The gun was taken away from him by his partner, Butz. It was of small caliber.

In a written statement made to the officers two days after the homicide, appellant related that after Currie had consumed some beer he had ordered, he said he could not pay for it, and when appellant insisted that he wanted the money Currie made an insulting remark, which angered appellant and he "came from in back of the bar after him, he hit me and I started after him. . . . We both hit each other a couple of times, I don't know whether he hit first or if I hit him first. The fellows that were in' there, those I mentioned above, and a few I don't know the names of, looked like they were sticking together. Les Halveland grabbed me from in back, by my arms and pulled me back into the rest of the bunch. I jerked one arm loose, and Johnny Currie was coming toward me. I had a gun in my back pocket. I pulled the gun out of my pocket and shot once at Johnny Currie."

Witness LaFleur, the only one of the frequenters called on the part of appellant, testified to the effect that he was engaged in the card game when there was an argument in the front end of the place. He heard a little scuffle and looked around, and thought it was all over. And appellant came over and stood by the aside of the card table and the first thing he new, Currie came around back of the table "and made a pass at Roy (appellant), and Roy fell, and when he fell the gun went off."

Butz, testifying on the part of appellant, said that he was behind the bar and heard a disturbance, and saw two men' had hold of appellant "they were dragging him back from the bar." Currie was then getting up off of the floor, and went toward appellant. The witness said to Currie, "Johnny, get out of here. I don't want any trouble here." Just at that time a racket started at the card table which he turned around to quell, and "saw Johnny Currie walk around behind me and hit Crowley on the left cheek. And when he did I heard a pop, just like a firecracker, and Johnny Currie fell."

Appellant's testimony was to the effect that Currie ordered two beers, and when served, he said, "I'll pay you tomorrow." Appellant replied, "No, you are not going to pay me tomorrow. You are going to pay me today. You know we are not giving any credit." Currie said, " 'To hell with you.' That is when I came from behind the bar and started to fight. They grabbed me and separated us, and Joe said—my partner said to 'cut it out.' I went on back to the back end part of the saloon—or I didn't—Les Halveland grabbed me, and he held on to me; kept taking me towards the back; kept talking to me; and I had my back turned to them, and I heard them, all chairs moving, and feet shuffling, and I turned around, and they were all around me. And all I know, I got socked from the back of the head, and from the front. And the next I knew I was on the floor. And the

gun went off.'' He further testified that when his back was turned, and he heard the feet shuffling and chairs moving, and "they were all on me," being in fear of his life, "I pulled the gun to get them away from me. And the next thing I knew I was on the floor, and the gun went off.'' He denied emphatically that he intended to shoot.

Other pertinent facts will be referred to in the course of the opinion in connection with the point to which they relate.

I. Numerous errors are assigned, the most serious one of which is that the court erred in failing to instruct the jury upon the hypothesis of accidental homicide. The State contends that appellant cannot complain because he requested no such instruction. Section 3986, R. S. 1929 (Sec. 3986, Mo. Stat. Ann., p. 2792) reads as follows:

"Homicide shall be deemed excusable when committed by accident or misfortune, in either of the following cases: First, in lawfully correcting a child, apprentice or servant, or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent; or second, in heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner."

And by the next succeeding section, 3987 (Sec. 3987, Mo. Stat. Ann., p. 2792) it is provided:

"Whenever it shall appear to any jury, upon the trial of any person indicted for murder or manslaughter, that the alleged homicide was committed under circumstances or in any case where, by any statute or the common law, such homicide was justifiable or excusable, the jury shall return a general verdict of not guilty."

Section 3681, R. S. 1929 (Sec. 3681, Mo. Stat. Ann., p. 3227) makes it the duty of the court whether requested or not to "instruct the jury in writing upon all questions of law arising in the case which are necessary for their information in giving their verdict." In 13 R. C. L., sec. 166, p. 864, it is stated: "Where there is evidence tending to show misadventure in a prosecution for homicide, failure to instruct the jury with reference thereto is error though no request is made for such instruction." The rule is laid down in Warren on Homicide, Vol. 4, sec. 340, p. 306, as follows: "Where the theory finds support in the evidence, it is the duty of the court to instruct fully and clearly as to the law relating to accident or misfortune." In State v. Coff, 267 Mo. 14, 183 S. W. 287, a case upon facts much less favorable to the accused than the case at bar, the point was directly decided, and the failure of the court to so instruct was held to be reversible error.

In support of its contention that a request for an instruction submitting the theory of accidental homicide is necessary, the State relies upon the following language found in the later opinion of this court.

in State v. Ray (Mo.), 225 S. W. 969, 1. c. 973: "The defendant, however, is in no condition to urge this matter before us for he asked no instruction in regard to this (accidental homicide) subject . . ." Standing alone, this single clause of a sentence may seem to give weight to the State's contention, but an examination of the opinion, and a reading of the entire sentence shows that this language was used argumentatively in reaching the ultimate conclusion that the point was not open for review because not preserved by the motion for new trial. Aside from this, the opinion had already held that the evidence in the case did not justify an instruction on that theory, so what was said about a request was not necessary to a decision, and was *obiter*. State v. Bartley, 337 Mo. 229, 84 S. W. (2d) 637, is also relied on by the State. In that case the accused offered an instruction submitting his defense of accidental killing, which the court refused. No instruction was given covering that defense. The refusal was held to constitute reversible error. In disposing of the point, the opinion says, "If appellant should request an instruction in proper form on the accident theory, it should be given." This was said, not in treating of the question as to whether it was a part of the law of the case upon which the court was required to instruct whether requested or not, but upon a consideration of a record wherein a request had been made. Insofar as the language quoted may be thought to be an implied holding that a request is necessary, it is contrary to the Coff case, supra, and is not of harmony with the authorities generally. It is apparent, however, that it was not intended to overrule or impair the authority of the earlier and controlling precedents without a discussion of, or even a reference to, them.

Appellant's evidence tended to show that he drew the gun for the purpose of defending himself—"to get them away from me" as he expressed it—which was a lawful act on his part; that while holding the gun with his back to the crowd and deceased, he was struck from the rear and from the front, and the next thing he knew he was on the floor, and without any intention on his part to shoot, the gun went off. We are of the opinion that this evidence, if believed by the jury, was sufficient to bring appellant's act within that portion of Sec. 3986, supra, which excuses a homicide if committed "in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent." Accordingly, the question should have been submitted to the jury as a part of the law of the case whether an instruction thereon was requested or not.

II. Another assignment is that the court erred in permitting the witness Ockel to testify to a statement alleged to have been made by appellant on Monday preceding the homicide to the effect that if a certain so-and-so came in there he was going to beat his brains out

and fill him full of lead. The point is that it was fragmentary and not shown to have been said in relation to deceased. More specifically, appellant's brief says, ''We recognize that under the rules in this state, the statement complained against, although general in nature, if properly connected up, would have been admissible.'' The witness Tranel was permitted to testify without objection that on the same occasion appellant said he knew who it was that robbed his place, and ''when he would meet him he would take care of him.'' When appellant's written statement was offered in evidence and read to the jury, his counsel stated specifically that there was no objection. In the written statement, appellant stated that the tavern had been robbed on several recent occasions, and that he had been informed about a week before the homicide that deceased was one of the robbers, and that he was ''going to make Currie own up to it.'' It will be recalled Ockel testified that when appellant knocked Currie down, he said, ''Tell me the other two fellows that was with you.'' Another witness, Sullivan, also testified appellant said at that time, ''You know what it is for, and you are going to tell me the other one, see.'' These facts were a sufficient predicate for the admission of the statement over the objection interposed at the trial, and urged on this appeal.

The other errors assigned are of such a nature that they are not likely to recur upon another trial, and for that reason need not be discussed. For the error noted, the judgment is reversed, and the caused remanded. All concur.