STATE of Missouri, Respondent,

v.

Lonnie RANDOLPH, Appellant.

No. 55699.

Supreme Court of Missouri,
En Banc.

June 19, 1973.

John C. Danforth, Atty. Gen., G. Michael O'Neal, Asst. Atty. Gen., Jefferson City, for respondent.

Robert R. Young, Barksdale, Abbott, Adams, Chorlins & Young, Clayton, for appellant.

HIGGINS, Commissioner.

Lonnie Randolph, charged with murder, second degree, was convicted by a jury which assessed his punishment at forty-five years' imprisonment. Sentence and judgment were rendered accordingly. §§ 559.-020, 559.030, V.A.M.S. (Appeal taken prior to January 1, 1972.)

Appellant contends (Point II) that the evidence, all of which was adduced by the State, was insufficient to sustain his conviction of murder, second degree.

On New Year's Eve, December 31, 1968, around 6:00 p. m., Freddie Holmes followed a woman, Madge Lee Robinson, and her 11-year-old grandson, Bobby, out of Kroger's Store on Lafayette Street, St. Louis, Missouri. He approached her from the rear, "snatched" her purse, ran to the corner of Ohio and Lafayette, turned and ran back, then down an alley and out on Eads where he saw some friends of his, among whom was Lonnie Randolph. Freddie shouted that a man, Raymond Sansoucie, was chasing him, and continued running. He last saw his pursuer at the corner of Eads and Ohio. He did not see any shooting but did hear two or three shots fired. Freddie told police he took a five-dollar bill from the purse, cashed it at Funsch's Drug Store, and gave Lonnie four one-dollar bills because he "was scared."

Ruth Sansoucie, her husband, Raymond, and four children were in an automobile on New Year's Eve 1968, and, at approximately 5:30 p. m., had last stopped at a drugstore at Jefferson and Eads and were driving on Lafayette when a "colored boy" was seen to take Mrs. Robinson's purse. Mr. Sansoucie said, "He's not getting away with that," and got out of the car to go after the thief.

Carmel C. Johnson of 2707-1/2 Eads Street was driving his automobile at 6:00 p. m., December 31, 1968, on Ohio Street near the corner of Eads. As he approached the corner, he saw seven or eight colored "guys" running after a white man. He heard one shout, "Don't let the S.O.B. get away. Shoot him." He also heard four or five shots fired but did not see anyone shot. He saw one youth with what appeared to be a gun in his hand but could not identify defendant, nor did he see any struggle between defendant and the man who was ultimately a victim of the shooting. He described the white man being pursued as tall, six feet, possibly six feet, three inches.

Richard Faulkner lived at 1629 Texas on December 31, 1968. He was watching the 6:00 p. m. news on his television when a man, Raymond Sansoucie, knocked on his door, asked for "Bill," and fell to the floor. His upstairs neighbor, Mary Sweeney, heard five or six shots at about this same time and later saw Mr. Sansoucie lying on the lower hall floor.

Madge Robinson was the victim of the purse-snatching sometime around 6:00 p. m., December 31, 1968. She saw her assailant run down Lafayette, double back, and then run down Texas. Her son, Lindell Robinson, upon learning of the purse-snatching, also gave chase following Mr. Sansoucie whom he described as five feet ten inches tall.

Officer William Meinhardt went to 1629 Texas and helped remove Mr. Sansoucie to City Hospital and ultimately to the city morgue. Dr. Enrique Cubillo pronounced Mr. Sansoucie dead on arrival at 6:30 p. m., December 31, 1968, at City Hospital. Dr. James Criscione performed an autopsy on Mr. Sansoucie on January 1, 1969. He found a gunshot entrance wound in the left back at the level of the eleventh intercostal space. The projectile traversed both

lobes of the left lung and exited from the body at the apex of the left shoulder. In his opinion, Mr. Sansoucie died of the described gunshot wound.

Lieutenant Ernest Troupe and Detective Richard Hummert arrested defendant at his home on February 17, 1969, and took him to police headquarters where he made statements as follows:

" * * * first thing Lonnie Randolph said, he said 'I been looking for it a long time. I might as well get it over. I'll tell you what happened.' He said 'Me and my friends were at a party on Eads.' And he said 'After the party we came downstairs and my friend was adjusting his pants, and he took a pistol out of his pants, and he handed it, he said "Hold this until I fix my pants." '

"And he said about this time a youth came running around the corner. And he said 'Chief, that dude is after me.' And so about this time he said the white fellow showed up. And just as he walked to the corner, he and the white fellow collided; so he grabbed ahold of the white fellow, and the white fellow grabbed him. He said 'What is this' or 'What are you doing' or something to that effect. And this time they became in a struggle. He said the white fellow began to fight back at him, and he thought he was going into his pocket to get some kind of a weapon, and at this time he reached in his belt and pulled out a gun, and the white fellow struck him, and as he was falling back he said his gun went off twice. He said he struck his head against the wall where he was standing. And I said 'What did you do after that?' He said 'About this time I looked up the street. The other boys was way up the street. I ran up the street and caught up with the two other fellows that I was with, gave the fellow back the gun, and I went home.' Q. Did he say which way he ran up the street and which street? A He went west. This was west on Eads to California, and then he met two other fellows, and he gave Cordell Lacey and a

fellow he said he knows as Reginald, he gave the gun to Reginald, and he said he departed and went on. Q Did he say where on Eads this New Year's Eve party was? A He pointed out the house to us at 2704 Eads. * * *

"Q Now, after this statement was made to you and Detective Hummert, did you take him anywhere? A Yes, sir; we did. Q Where did you take him? A Back to the scene. Q When you say 'the scene,' where do you mean? A Ohio and Eads. * * *

"He said he understood, and he pointed to the detective with me, Detective Hummert, and he had Detective Hummert come over to him, and he told him, he said 'You stand like this,' and he grabbed ahold of Detective Hummert and showed him the exact spot where he and Mr. Sansoucie encountered one another, first at the corner, and then he said they scuffled from the corner back about ten or fifteen feet from the corner. And this is supposed to be the place where he said the shooting was done. Q And how did he say the shooting was done? How did he describe it? * * * Tell us what he either did or said there at the intersection of Ohio and Eads.

"A He said 'At first, I was standing here on the corner,' and he said 'Just as I was talking to my friend,' he said 'a youth came running around the corner and he passed me and he said "Chief, that dude is after me." ' I said 'Well, who was this made this statement?' He said 'A kid as I recognized lived out in the Peabody and Darst Apartments.' And I said 'Then what happened?' He said 'By the time that I could get around the corner where I could fully see, I ran into Mr. Sansoucie, the white fellow, and I grabbed him, and he grabbed me, and we tussled, and he said "What are you doing" or "What you got to do with it" ' something to this effect. And he said 'We started to wrestle and wrestled from the corner, about ten feet from the corner, and I thought the man was getting a weapon out of his pocket.'

And he said 'I pulled the revolver out of the waistband of my pants and I pointed it at him, and at this, Mr. Sansoucie struck me. I fell backwards, my head hit the wall, and the pistol went off accidentally twice.' I said 'A pistol went off accidentally twice?', and he said 'yes, sir.' Q Did he demonstrate this physically? A He did. * * * He said as he and Sansoucie tussled around the corner, he grabbed Sansoucie like this. And his coat was open like this. And in turn Sansoucie had ahold of him, and they were fighting each other trying to get away like this. He said finally he broke loose, and Sansoucie reached for something; and at this time he reached into his waistband and pulled— * * * Q You're playing the part of— A Randolph. And you're Sansoucie. And I said they were wrestling like this. He grabbed ahold of Sansoucie. Sansoucie grabbed ahold of him. Sansoucie struck him and he fell back. Q He fell back this way? A He grabbed his pistol out like this, and he said Sansoucie hit at him again, and his head went back and hit the wall, and the gun went off as he was falling.

"* * * Now, when you fall against the wall, tell us how he re-enacted the firing of the gun. A He said he had the gun in his hand, and as he fell back just like this, the gun went off twice."

Appellant argues "the only evidence indicating the circumstances under which the deceased was shot was the statement of defendant introduced by the state. It shows beyond question that the shooting was *accidental.* * * * There is no evidence from which 'malice,' 'malice aforethought,' 'feloniously,' 'premeditatedly' or the other requisites of murder second degree can be inferred or implied."

■ In order for the State to make its case of second degree murder, it must show the killing was willful, premeditated, and with malice aforethought. State v. Bruton, Mo., 383 S.W.2d 525, 528; State v. Ayers, Mo., 470 S.W.2d 534, 537. See also

State v. Whited, 360 Mo. 956, 231 S.W.2d 618, 621.

The jury reasonably could find that: Mr. Sansoucie, a white man, was intercepted in his pursuit of a purse snatcher; a group of seven or eight youths were seen pursuing a white man at the time Mr. Sansoucie was shot, one with gun in hand, and one shouting not to let him get away and to shoot him, after which four or five shots were fired; defendant admitted shooting deceased at the time of these incidents; Mr. Sansoucie was shot in the back and died from such wound.

■ The element of willfulness is demonstrated by the pursuit of deceased, and the shooter's response to the command to shoot and not to let the pursued man get away. The element of premeditation was shown by the chase and interception of Mr. Sansoucie and the subsequent shots. The element of malice may be presumed from such intentional killing with a deadly weapon in these circumstances. State v. Hammonds, Mo., 459 S.W.2d 365, 368. See also State v. Gregg, Mo., 399 S.W.2d 7, 10.

Appellant contends (Point I) that the court committed prejudicial error in failing to instruct the jury on the defense of excusable homicide resulting from the accidental discharge of the gun because "such instruction is part of the law of the case, is plain and reversible error when not given, and [it] need not be requested nor [the failure to give] asserted in the motion for new trial."

Instruction No. 1 covered murder, second degree, and manslaughter, and defined "willfully," "premeditatedly," "malice," "malice aforethought," "feloniously," "excusable homicide," and "justifiable homicide." Instruction No. 2 submitted defendant's right of self-defense. Other instructions covered the voluntariness of defendant's statements, presumption of innocence, credibility of witnesses, remarks and argument of counsel, and necessity of unanimous verdict.

The issue is whether, in this case, the court erred in failing to instruct, irrespective of request and absent preservation of such error, on the defense of excusable homicide resulting from accidental discharge of the gun. State v. Patterson, Mo., 443 S.W.2d 104, 106–107 [2].

There is no question that the State adduced evidence from which a jury reasonably could find, among other things, that the homicide resulted from an accidental discharge of the gun; and the accident instruction must be given if the facts raise such an issue. State v. Ameen, Mo., 463 S.W.2d 843. In that case, a conviction for murder, second degree, was reversed for failure to give the accident instruction. The court reviewed a number of "scuffling over gun" cases, and held that failure to instruct on accident was not cured by the instruction on murder, second degree, "containing the words 'wilfully, feloniously, premeditatedly, and of his malice aforethought', or by the instruction on manslaughter, which the jury was to consider if defendant were found not guilty of murder in the second degree and contained a definition in general terms of justifiable and excusable homicide." 463 S.W.2d l. c. 845.

■ Failure to instruct on excusable homicide because of accident constitutes plain error in this case affecting substantial rights warranting reversal notwithstanding failure to request such instruction and failure to assert such error in the motion for new trial. State v. Haygood, Mo., 411 S.W.2d 230; Rules 26.02(6), 27.20(c), V.A.M.R. That case also reversed a conviction for murder, second degree, for failure to give the accident instruction; and there was no request for such instruction, nor was the error for failure to so instruct asserted in the motion for new trial. Defendant Haygood's own testimony was that he had gone to his former wife's home to talk reconciliation, stayed during the night, an argument ensued, his wife "came at him" with a butcher knife, they grappled, he obtained a pistol and, while the scuffle continued, the gun discharged. See also: State v. O'Kelley, Mo., 213 S.W.2d 963, where defendant testified the gun was discharged while he and deceased were scuffling for its possession, and the court reversed a conviction for murder, second degree, for failure to submit the defense of accident, irrespective of request; State v. Stone, 354 Mo. 41, 188 S.W.2d 20, in reversal of a conviction for manslaughter for failure to instruct on the defense of accident, where defendant offered no evidence but "there were statements in a confession offered by the State, which, if believed, although taxing one's credulity, permitted of a finding that [deceased] drew a pistol and threatened defendant; that defendant wrestled with him for the gun; that a shot or shots were fired, and when it was over defendant, without knowing how it happened had the gun" (188 S.W.2d l. c. 22 [7]); State v. Crowley, Mo., 139 S.W.2d 473, reversed a conviction for murder, second degree, for failure to submit the defense of accident, on defendant's evidence that tended to show he drew the gun for purposes of self-defense, and while holding the gun with his back to the crowd and deceased, was struck from the rear and from the front, and the next he knew he was on the floor and without any intention to shoot on his part, the gun discharged. Note also that where there is evidence warranting a finding that a homicide was accidental, such defense must be submitted as a part of the law of the case; and this is so in the face of an argument "that the verdict of second degree murder shows the error [in failing to so instruct] to be harmless as defendant was found guilty of a willful, premeditated and malice aforethought killing, negativing an unintentional or accidental killing." State v. Bradley, 352 Mo. 780, 179 S.W.2d 98, 101 [4].

The State does not respond to these propositions and authorities, and limits its argument in support of the instructions as given to "two independent grounds for denying such an [accident] instruction. The first ground is that there is not sufficient evidence upon which to base the giving of in-

structions on inconsistent defenses [i. e., self-defense and accident]. The second ground is that even were there sufficient evidence to warrant the giving of an accident instruction, appellant's prior unlawful conduct precluded the giving of an accident instruction."

■ With respect to the first ground, it has been held that self-defense and accident are inconsistent defenses, and the defendant alone may not provide the basis for submitting such inconsistent defenses to the jury. State v. Peal, Mo., 463 S.W.2d 840. To bring itself within this proposition, the State argues "the sole basis for submitting either defense to the jury was appellant's self-serving statement made to the police * * * and reiterated during the reenactment of the shooting at the corner of Eads and Ohio."

■ The difficulty with this position is that defendant offered no evidence, and the State adduced the evidence of defendant's confession which contained, in addition to admissions of guilt, the elements of both self-defense and excusable homicide by accidental shooting. Where the evidence on such inconsistent defenses is "offered by the State [as in Randolph's case] or proved by third party witnesses for the defendant," instruction on the inconsistent defenses is justified. State v. Peal, supra, l. c. 842.

■ With respect to the second ground, respondent cites State v. Browning, Mo., 442 S.W.2d 55, and asserts that "Appellant's assault upon Mr. Sansoucie prior to the shooting prohibited his reliance on the defense of excusable or accidental homicide."

Substantially the same argument was rejected in State v. Ameen, supra. In State v. Browning, supra, the court held the facts did not demonstrate homicide by accident in the course of a lawful act. Browning's coat was missing at a party and he held all the guests at gunpoint and threatened to kill anyone who touched the door until his coat was produced. When deceased went to the door, defendant shot him and threatened to shoot others. Defendant testified that deceased lunged at him as though to grab the gun and when defendant pulled his hand back to avoid this, the gun discharged. Properly, the court held defendant was not entitled to an accident instruction because in holding his fellow guests at gunpoint and threatening to shoot them, he was engaged in unlawful acts such as exhibiting a deadly weapon in a rude, angry or threatening manner in violation of Section 564.610, V.A.M.S., and by his own admission was guilty of thus depriving his fellow guests of their liberty.

Respondent tacitly concedes that the court properly instructed on defendant's right of self-defense, the very essence of which is lawful conduct on defendant's part, 40 Am.Jur.2d 429, §§ 139 et seq.; and there was evidence in defendant's confession, adduced by the State, to show lawful conduct with respect to the right to self-defense and that the killing was accidental rather than intentional. State v. Ameen, supra, 463 S.W.2d l. c. 845.

■ As demonstrated in the statement of fact, particularly by defendant's confession, adduced by the State, the evidence warranted an instruction on excusable homicide resulting from accidental discharge of the gun. The instruction was not given, and such failure deprived defendant, in this case, of a real defense, and constituted "plain error affecting substantial rights" requiring reversal of the judgment of conviction.

Appellant complains also of infringement of his right to a fair and impartial trial on account of asserted inadequate representation and prejudicial conduct of the prosecuting attorney, and of error in failing to admit alleged dying declaration of deceased asserted to be helpful to defendant.

It is not necessary to discuss these contentions because such incidents are not likely to occur, if at all, in the same manner upon retrial.

For the reason indicated, the judgment is reversed and the cause is remanded.

PER CURIAM:

The foregoing opinion by HIGGINS, C., is adopted as the opinion of the Court en Banc.

SEILER and MORGAN, JJ., concur; FINCH, C. J., concurs in separate concurring opinion filed; DONNELLY and BARDGETT, JJ., concur and concur in separate concurring opinion of FINCH, C. J.; HOLMAN and HENLEY, JJ., dissent.

FINCH, Chief Justice (concurring).

I concur in the principal opinion but file this additional explanation only in the interest of making clear that it is my understanding that we are not holding that failure to instruct on the law of the case automatically results in plain error. We expressly held to the contrary in State v. Patterson, 443 S.W.2d 104 (Mo. banc 1969), and it is my understanding that what we said there continues to be the rule. Under that decision, we determine on a case to case basis whether manifest injustice or a miscarriage of justice has occurred as the result of the failure of the court to give an instruction required under the law of the case.

In this case, the State's evidence was sufficient to entitle defendant to an instruction on excusable homicide resulting from accidental discharge of the gun. Consequently, the defendant was entitled to such an instruction, whether requested or not, as a part of the law of the case. The court did not so instruct, but instead gave an instruction on self-defense. In my judgment, the evidence did not support such an instruction. Defendant's account of the occurrence as related to the jury claimed accident, not self-defense. In addition, the evidence disclosed that deceased was shot in the back. Under such circumstances, it was confusing to instruct the jury on self-defense, which the evidence did not support, and at the same time fail to instruct on accident when the evidence introduced by the State as to what the defendant said was sufficient to authorize an instruction on excusable homicide resulting from accidental discharge of the gun. In this confusing situation, I conclude that the failure of the court to instruct on the defense of excusable homicide resulting from accidental discharge of the gun was plain error in this case for which a new trial should be granted.