**STATE of Missouri, Plaintiff,**

v.

**Merle Edward ZWEIFEL, Defendant.**

**No. 39555.**

Missouri Court of Appeals,
Eastern District,
Division Four.

Feb. 24, 1981.

Motion for Rehearing and/or Transfer to
Supreme Court Denied April 24, 1981.

Zenge & Smith, Canton, Charles A. Powell, Macon, for defendant.

John D. Ashcroft, Atty. Gen., Lyman Smith, Robert Presson, Asst. Attys. Gen., Jefferson City, William O. Green, Pros. Atty., Scotland County, Memphis, for plaintiff.

SMITH, Presiding Judge.

This case reaches the writer on reassignment. The case involves application of the doctrines established in *Hemphill v. State*, 566 S.W.2d 200 (Mo. banc 1978) upon a claim of ineffective assistance of counsel on appeal. In that case the Supreme Court held that a claim of ineffective assistance of counsel on appeal was not cognizable on a motion under Rule 27.26 in the trial court.

> "Relief from defects in proceedings before the appellate courts are beyond the scope of the remedy and such relief should be sought only in the appellate court of rendition and there by motion to recall the mandate, vacate the sentence of affirmance and redocket the cause for rehearing." *Hemphill v. State, supra.* [15, 16].

*See also State v. Schaffer*, 383 S.W.2d 698 (Mo.1964) [6–9]; *Gerberding v. State*, 433 S.W.2d 820 (Mo.1968) [3, 4]; *Wilwording v. State*, 438 S.W.2d 447 (Mo.1969) concurring opinion of Finch, J. [10]. The premise upon which *Hemphill* and its predecessors is based is the constitutional right of a convicted defendant to counsel upon appeal and the corollary proposition that he is entitled to *effective* assistance of counsel. *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); *Hemphill v. State, supra.*

Defendant was convicted of manslaughter and sentenced to five years imprisonment. We affirmed that conviction. *See State v. Zweifel*, 570 S.W.2d 792 (Mo. App.1978). Thereafter defendant filed a "motion to recall mandate, vacate judgment, and redocket the cause for rehearing on appeal." This motion was served on the Attorney General, who filed suggestions in opposition to the motion. Following receipt of counter-suggestions this court sustained the motion and granted a rehearing. The matter was briefed by both parties and argued to the court. Although *Hemphill, supra*, has been with us for several years, we have no cases or rules which establish the procedures to be followed in handling that genre of cases. Although both the State and the defendant have submitted supplemental briefs to us on the potential problems in procedure we do not intend here to establish procedures for handling *Hemphill* cases. It is necessary, however, for us to state the procedures we are following in this case and the issues which we believe are before us. When the matter has been presented to us initially as this has been—namely through a motion to recall with suggestions both in support and in opposition—our initial determination is whether the motion sets forth sufficient specific factual allegations to believe that the extreme relief of recalling a mandate is warranted. That relief should only be granted if, on the allegations, there are strong grounds to believe that counsel has failed to assert on appeal a claim of error which would have required reversal had it been asserted, and which was so obvious from the record that a competent and effective lawyer would have recognized its importance and asserted it.[1] *See Cole v. State*, 573 S.W.2d 397 (Mo.App.1978). This standard will inevitably closely track the standard set forth in Rule 30.20, the plain error rule—that the error is such as to effect substantial rights resulting in manifest injustice or a miscarriage of justice.

Normally, when a rehearing is granted:

---

1. We deal here with a situation where counsel has in fact adequately briefed the points he raised but is charged with ineffectiveness in failing to assert a point on appeal. We do not deal with inadequacy or ineffectiveness arising from improper briefing or failure to represent the client at all.

"[T]he appeal stands as if it had never been heard and the opinion filed becomes a nullity as if it has never been written." *State v. Barnes,* 517 S.W.2d 155 (Mo.App. 1974) [19–2].

▆▆▆ We do not believe, however, that such a situation in the peculiar nature of a *Hemphill* case requires us to reexamine the issues previously raised and ruled upon the original appeal. If it does we herewith adopt our opinion in *State v. Zweifel, supra,* on the issues therein discussed. Nor do we believe that granting a rehearing requires us to rule on issues which were not asserted on the original appeal and which do not meet the standard heretofore set forth as justifying the recall of our mandate. We will not, therefore, reach those points raised by defendant which deal with ineffectiveness of counsel during the trial or points charging errors which would not have compelled reversal under the plain error rule if they had been raised and determined to be error. We must determine the merits of the claims of error asserted which led to granting the rehearing and if meritorious, whether the failure to raise them constituted ineffective assistance of counsel. Our order granting defendant's motion to vacate did not constitute a resolution of those issues; it was merely a preliminary determination that the allegations were sufficient to raise the issues. Having thus framed the scope of our review on this appeal, we turn to the merits of defendant's claim.

The thrust of defendant's charge of ineffectiveness of counsel relates to the failure to assert on appeal the alleged error of the trial court in failing to instruct the jury on excusable and/or justifiable homicide. Neither of these points was preserved in the motion for new trial nor advanced on appeal. The facts of this case were set forth in *State v. Zweifel, supra,* and those need not be repeated here. As indicated in that opinion there was evidence to support a conclusion that the altercation or scuffle which resulted in the death of Mr. Erwin was either in the nature of mutual combat or was provoked by Erwin. There was also evidence to support a conclusion that defendant was the aggressor. We set out at length in the appendix hereto the testimony which supports a conclusion that Erwin was the provocateur or was at least a mutual combatant.

We deal first with excusable homicide. Section 559.050 RSMo 1969 (the statute applicable at the time of the victim's death) provides:

"Homicide shall be deemed excusable when committed by accident or misfortune, in either of the following cases:

(1) In lawfully correcting a child, apprentice or servant or in doing any other lawful act by lawful means, with usual and ordinary caution, and without unlawful intent; or

(2) In heat of passion, upon any sudden or sufficient provocation, or upon sudden combat, without any undue advantage being taken, and without any dangerous weapon being used, and not done in a cruel and unusual manner."

▆▆▆ The law in this state, so firmly established as to be conceded by the state, is that if there is any evidence to support excusable homicide the trial court must give an instruction on that special negative defense whether requested or not. *See* MAI CR and MAI–CR 2d 2.28 Notes on Use; *State v. Sanders,* 541 S.W.2d 530 (Mo. banc 1976); *State v. Randolph,* 496 S.W.2d 257 (Mo. banc 1973). By far the bulk of the cases on excusable homicide deal with accidents in the handling of deadly weapons which arise under the first numbered alternative in the statute. There, a requirement that the defendant invoking the accident defense must have been acting in a lawful manner is imposed. *State v. Stubenrouch,* 591 S.W.2d 42 (Mo.App.1979). The statute does not impose the lawful act standard on the second numbered alternative. Instead the second alternative recognizes the all-too-human proclivity to engage in physical combat upon provocation and makes a death resulting therefrom excusable so long as the combat is not conducted in an unduly dangerous way. The second alternative applies to the evidence adduced in this case on

behalf of defendant. There was abundant evidence that defendant responded to provocation by Erwin (the sufficiency of that provocation would be a jury question) and that the defendant and deceased engaged in sudden combat arising from that provocation or instituted by the decedent. We cannot say that the evidence establishes as a matter of law that undue advantage was taken, that a dangerous weapon was used, or that defendant acted in a cruel and unusual manner. There was evidence to support excusable homicide and an instruction on that defense was required.

In *State v. Randolph, supra,* the Supreme Court held that the failure to give an excusable homicide instruction was "plain error" requiring reversal. *See also State v. Haygood,* 411 S.W.2d 230 (Mo.1967). In *State v. Sanders, supra,* the Supreme Court stated that the determination of whether "plain error" exists is to be made on a case by case basis and refused to invoke the doctrine. Our review convinces us that here the failure to so instruct was plain error requiring reversal. The jury was instructed upon murder second degree and manslaughter. The latter instruction premised a finding of guilt upon believing that defendant "caused the death of C. Carson Erwin by assaulting and striking him ...." Throughout the trial and on appeal, defendant's counsel based virtually his entire presentation upon the question of causation. The thrust of this defense was that an earlier myocardial infarction suffered by Erwin, unknown to him or anyone else, could have resulted in his death from causes unrelated to the scuffle or altercation with defendant. In this posture the question of excusable homicide as a defense to manslaughter was never brought to the jury's attention. In view of this trial strategy and the manslaughter instruction, the jury was virtually compelled to find defendant guilty if it believed the struggle was the proximate cause of death. This becomes more apparent upon viewing the second degree murder instruction which specifically told the jury that it could not find defendant guilty of that offense if it found the assault was done "in anger, fear, or agita-

tion suddenly provoked by the unexpected acts or conduct of ... Erwin." The jury acquitted defendant of second degree murder. The absence therefore of an excusable homicide instruction took from defendant virtually the only defense of substance that he had. In this posture we conclude that the failure of the trial court to give such an instruction constituted plain error resulting in manifest injustice to defendant. Had the matter been raised on the original appeal, we would have been compelled to reverse the judgment and remand for new trial.

From what we have said we also conclude that counsel's failure to raise the matter on appeal constituted ineffective assistance of counsel. We make no judgment of counsel's trial strategy in concentrating his efforts at trial on the causation question rather than presenting both causation and accident to the jury for consideration. But on appeal the danger of presenting both issues as alternatives is not present. The unfortunate circumstances of this death made apparent the availability of the defense and the established law makes clear that failure to instruct on accident is error and frequently plain error. *State v. Randolph, supra.* We believe the matter was so apparent and so well-established in law that a competent and effective counsel would have raised it. Counsel for defendant at trial and on appeal had a well-deserved lifetime reputation for competence. In this case, however, we conclude that he was ineffective in his handling of defendant's case on appeal.

We therefore conclude that defendant had ineffective assistance of counsel on appeal, that ineffectiveness precluded a proper review of his conviction, and that upon the merits of the appeal as now presented defendant's conviction must be reversed and remanded.

Defendant also complains of the failure of the trial court to instruct on justifiable homicide i. e. self-defense. That defense also must be instructed on whether requested or not if supported by evidence.

It has been repeatedly held that self-defense and accident are mutually inconsistent. *State v. Randolph, supra; State v. Williams,* 545 S.W.2d 342 (Mo.App.1976). Certainly this is true where a dangerous weapon is involved, for either the defendant intentionally used the weapon (self-defense) or it was discharged or used accidentally (accident). It is not as clear, however, that a defense of accident under alternative two of the statute is necessarily inconsistent with self-defense. In both situations the conduct of defendant is intentional and the applicability of one defense or the other may well depend on the degree of provocation involved which causes the defendant to act and the degree of his response thereto. Those determinations are for the jury, and its conclusion, for instance, that the provocation was insufficient to justify self-defense should not preclude it from finding that provocation sufficient to cause defendant to act in the heat of passion. In any event, the two defenses must each be submitted where evidence to support either comes from other than the defendant's testimony. *State v. Randolph, supra.*

■ Our review of the record does not convince us that the evidence in defendant's trial supported an instruction on self-defense. Defendant was entitled to defend himself against a reasonably believed threat of death or great bodily injury. *State v. Mares,* 570 S.W.2d 332 (Mo.App.1978) [4]. There is no evidence to support a belief that he was in danger of either. He is also entitled to use deadly force to defend himself against a threatened felony against himself. *See,* 559.040, RSMo 1969. He is not entitled to exert deadly force to resist an assault and battery. *State v. Walker,* 525 S.W.2d 826 (Mo.App.1975) [2, 3]. That was the most that he was threatened with here, and his resistance to that threat would support an excusable homicide submission but not justifiable homicide. It is just such resistance, not rising to the level of deadly force, that alternative two of the excusable homicide statute covers.

\* The names are those of the witnesses.

Judgment reversed and cause remanded for new trial.

SATZ, J., and ALDEN A. STOCKARD, Special Judge, concur.

## APPENDIX

*STATE'S CASE*

*Mr. West:* \*

Q. Mr. West, could you tell whether or not upon your coming out into the hallway there was Mr. Erwin in any physical contact with the Defendant, Mr. Zweifel, at that time? Were they touching one another?

A. No, they weren't.

Q. Can you tell me what they were doing?

A. They were talking.

Q. Were you able to determine whether or not—What was the nature of their conversation, as best you can recall?

A. The best I could tell it was about Mr. Zweifel's son, Carl, about a student.

Q. Tell the Court the best you can what the conversation was? Who said what?

A. When I came out the first thing I heard was—I can't really say the first thing. It was in the conversation about 'been calling my son a liar.'

Q. Who said that?

A. Mr. Zweifel.

Q. Then what do you recall was said?

A. Mr. Erwin said that 'He was supposed to have been working with you. Supposedly he wasn't. He was seen down town, seen working on his car. Wasn't with you.' Mr. Zweifel said, "You're calling my son a liar. He does not lie." He said, "You're not to lay a hand on my son."

Q. Then what happened?

A. Mr. Erwin said, "I don't hit them. I use a paddle." I didn't understand that part of the conversation, but that's what I heard.

. . . . .

Q. Now, you may continue, Mr. West, and try as best you can to testify exactly what each person said in the sequence as best you recall it.

A. I remember Mr. Erwin holding out his hand. Apparently that was when he was holding Carl's elbow. Still I didn't know Carl was in the office.

Q. All right. Then what happened?

A. Things calmed down after he said, "You can't call my son a liar." Mr. Erwin bent down and picked up his tie, and Mr. Zweifel picked up his sailor hat, kind of a stocking cap, blue in color. I thought things were going to calm down.

. . . . .

Q. What did you observe about the condition of Mr. Erwin at that time, particularly with regard to his clothing?

A. His collar was open. Looked like there might have been a button tore off down in here. I would say disheveled. His shirt was pretty much out of his pants like there had been movement. His shirt was messed up. His tie was on the floor. He was, I would say, in a state of irritation.

Q. Now what is the next thing you remember happening?

A. Mr. Erwin said, "You're not man enough to come up here and tell me what to do. You're not big enough." Then that's when Mr. Zweifel jumped him.

Q. Tell the Court and jury what you saw Mr. Zweifel do?

A. He tried to grab hold of Mr. Erwin. Mr. Erwin kept beating him off, trying to keep his hands out of reach. Finally he shoved him. He got him around the neck, and then he twirled around and went over the desk. That's when he was on top of him.

* * * * * *

Q. Would you tell the jury what size man Mr. Erwin was?

A. He was over six foot.

Q. How much did he weigh?

A. It would have to be over two hundred pounds.

Q. Would it have been as much as two hundred forty pounds?

A. I'd say two hundred thirty-five.

Q. Would you say he was as much as six feet two inches tall?

A. Six one to six two, yes.

Q. How tall would you tell this jury Mr. Zweifel is?

A. I'd say about five feet eight inches.

Q. How much would you say he weighs?

A. Possibly a hundred seventy to seventy-five.

Q. Would you say it could be as little as a hundred sixty?

A. No.

* * * * * *

*Mr. Palmer:*

Q. Would you tell the Court and jury what you recall did happen while you were in the study hall that day?

A. The first unusual thing I heard were loud voices being raised somewhere in the vicinity of the superintendent's office.

Q. What did you do?

A. Nothing at that time.

Q. Did you at anytime that morning have occasion to view an incident which occurred outside the superintendent's office?

A. Yes. The verbal argument continued and later scuffling occurred, and I left the study hall and went out into the hall.

Q. Was it that scuffling and verbal argument that attracted your attention at the time you went out?

A. The scuffling did, yes.

Q. After you got out in the hallway what did you observe?

A. Mr. Erwin and Mr. Kimberly—Mr. Kimberly is the science teacher there—had a person placed against the wall opposite the office door.

Q. Had you ever seen that person before?

A. I had seen him but didn't know who he was.

Q. What did you do after getting out in the hallway and seeing this?

A. I walked directly over to where they were and listened as they talked.

Q. Tell the Court and jury your recollection about what they were talking about, if you would?

A. Mr. Kimberly and Mr. Erwin were holding Mr. Zweifel, and the first statement I heard was Mr. Erwin said, "You swung at me, didn't you?" No answer from Mr. Zweifel. Mr. Zweifel went on to say, "You called my son a liar, and you can't do that." Again Mr. Erwin said, "You swung at me, didn't you?" Again, no answer. And he continued with, "You called my son a liar, and you can't do that. My son doesn't lie." This is Mr. Zweifel. Mr. Erwin said, "You're not big enough man to come up here and try to run the school." And the argument continued, repeating the same words a couple of times.

\* \* \* \* \* \*

Q. When you first got out in the hallway, I believe you testified you observed Mr. Erwin and Mr. Kimberly having an individual up against the wall. Is that a fair characterization of what your testimony was?

A. Yes, it is.

Q. Can you tell me, where did they have the individual restrained?

A. They had him pushed with their forearms up against a short wall there in the hallway.

Q. Is that just down the hallway from the storage room door?

A. It's directly adjacent to it.

Q. All right. Tell us then, if you will, what transpired after that?

A. As they talked, the conversation about 'liar' and 'you swung at me, didn't you,' they gradually released Mr. Zweifel. Mr. Kimberly stepped back to where he was along side of me, and Mr. Erwin for awhile kept him at arm's length and finally he completely released Mr. Zweifel, and he went to where he was more or less straddling the threshold of the office door.

Q. Mr. Erwin did that?

A. Yes.

Q. Did the conversation continue at that time between Mr. Erwin and Mr. Zweifel?

A. Yes.

Q. Can you tell the Court and jury what the nature of that conversation was?

A. Much of it was just repetition of what they said. The liar part was gone over, I think twice, and 'you swung at me,' and 'you're not big enough to try to run this high school.' Then Mr. Erwin's attention was turned to Carl, in conversation with him.

Q. At this particular time, Mr. Palmer, the period of time about which you've just testified, was there any physical contact between Carson Erwin and the Defendant?

A. After he released him, there wasn't.

Q. I believe you said he directed his attention to Carl Zweifel. Can you tell the Court and jury where Carl Zweifel was at that time?

A. When I first left the study hall I couldn't see Carl because he was still standing inside the office, but after I got up with the others I could see him standing inside.

Q. When you say that he directed his attention to Carl, what did he do?

A. He placed his hand on Carl's elbow and discussed with him an absentee that Carl had had that week.

Q. Okay. Tell us the best you recall what the nature of that conversation was.

A. He just went over the procedure of having a written excuse when a student was absent, and went over the excuse Carl had given him wasn't true and that someone had told him Carl wasn't working with his father and was working on his own car at home.

Q. Okay. Then what happened?

A. He was still holding to Carl's elbow, and Mr. Zweifel said, "Take your hands off my son. You can't put your hands on my kid," or something to that effect. Again Mr. Erwin said, "You're not big enough to

come up here and try to run the high school." Then the second conflict started.

Q. All right. Tell us about that second conflict. Who did what?

A. Mr. Zweifel was still basically close to that short wall, and he came off the wall and lunged at Mr. Erwin, and his force pushed them back into the office.

\* \* \* \* \* \*

Q. ... On the morning that you were, I believe, in the study hall doing some preparation for another class, did you recognize any of the loud voices that you heard?

A. I recognized Mr. Erwin, and I thought I recognized the other voice. It turned out later I was wrong.

Q. All right. But you did recognize Mr. Erwin's voice as being one of the loud voices you heard?

A. Yes.

Q. But, as I understood it, you didn't go out in the hall until you heard some scuffling, is that correct?

A. Right.

Q. So you obviously didn't know what had transpired other than just some noises, is that true?

A. Correct.

Q. Now, when you got out in the hall where you could see, Mr. Erwin and Mr. Kimberly as I understand it were holding a Mr. Zweifel against the wall somewhere in the vicinity opposite the doorway that went into the office, is that correct?

A. Right.

Q. So you obviously didn't know what had transpired other than just some noises, is that true?

A. Correct.

Q. Now, when you got out in the hall where you could see, Mr. Erwin and Mr. Kimberly as I understand it were holding a Mr. Zweifel against the wall somewhere in the vicinity opposite the doorway that went into the office, is that correct?

A. Correct.

Q. Mr. Palmer, when Mr. Erwin and Mr. Kimberly released Mr. Zweifel, did Mr. Zweifel make any effort to attack either one of them?

A. No, he didn't.

Q. Did Mr. Zweifel have anything in his hand? Any kind of instrument or implement of any kind that you ever saw?

A. I never noticed anything.

Q. Did you ever hear Mr. Zweifel use profanity or make any threats against anyone?

A. No profanity. The only threat was, "You can't call my son a liar."

Q. Just that the superintendent couldn't call his son a liar?

A. Yes.

Q. When you spoke about Mr. Zweifel moving the second time when the scuffle started again, and you said he went across the hallway toward Mr. Erwin, did he have his hand drawn back to hit him, or did it look like he was just trying to push him away from his son?

A. I didn't see his hand drawn. He went forward, more towards a grasping hold.

Q. And at that time Mr. Erwin still had hold of Mr. Zweifel's son, following this conversation about him not having been with his father but working on his car on Tuesday, or words to that effect. Is that correct?

A. I don't remember when the release of the elbow came.

Q. Now then, as I understand it, Mr. Erwin grabbed Mr. Zweifel as they came together. Is that correct?

A. I really couldn't tell. They looked like they were entwined.

Q. What was the size, physical size, of Mr. Erwin?

A. Probably two hundred forty, six one.

Q. What would you say, what would be your best judgment as to the height and weight of Mr. Zweifel?

A. Oh, one hundred seventy, five six.

\* \* \* \* \* \*

*Mr. Kimberly:*

Q. Mr. Kimberly, did you have occasion to overhear and observe anything unusual or extraordinary which occurred outside your classroom on that day?

A. Yes, sir, there seemed to be shouting and a lot of movement next door in the superintendent's office next door.

Q. Speak up, please. Can you tell me what did you do when you first heard the voices out in the hallway?

A. I excused myself from the pupils in the classroom, and walked into the hallway.

Q. Upon getting out into the hallway what did you observe?

A. Mr. Zweifel was reaching, attempting to grasp Mr. Erwin around the lapels and upper portion of his body, and Mr. Erwin was fending him off by raising his arms like this, and they were, I believe they were just kind of pushing and shoving.

\* \* \* \* \* \*

Q. What is the first thing you said or did upon getting out in the hallway there?

A. I don't remember exactly what I said, but I moved towards Mr. Zweifel, and at that time they were pushing each other. I moved toward Mr. Zweifel and grasped him in the upper area of his body and aided Mr. Erwin in shoving him against the wall.

. . . . .

Q. What did you observe about the nature of the conversation being had between Mr. Zweifel and Mr. Erwin at this particular time?

A. They were arguing and Mr. Zweifel was referring to, saying something to the effect that, "You can't call my son a liar." This is just previous to me grasping him.

Q. Do you recall what Mr. Erwin's response was to that?

A. Mr. Erwin said something to the effect of, "You can't come up here and tell me how to run the school this way."

Q. Just continue then, if you will, and tell us what you recall happened?

A. At that time I pushed Mr. Zweifel, and Mr. Erwin and I pushed Mr. Zweifel up against the wall, and he seemed to become calm. At that time I guess other people in the upper portion of the building became interested, and I noticed footsteps coming out of the other rooms. I heard that. Mr. Erwin said something to the effect, at about that moment, "You swung at me, didn't you?" And Mr. Erwin's tie and shirt was disordered, evidently from the scuffle.

\* \* \* \* \* \*

Q. All right, Now then the two of you— Mr. Erwin was substantially taller and substantially heavier than Mr. Zweifel, isn't this true?

A. Yes.

Q. So he and you were holding Mr. Zweifel up against the wall?

A. Yes.

Q. When you let go of Mr. Zweifel did he make any effort to hit or attack you in any way whatsoever?

A. No.

. . . . .

Q. Mr. Kimberly, Mr. Zweifel made absolutely no move to attack Mr. Erwin after he was let go either, did he? When you let him go he didn't attack anybody, did he?

A. Right then, no.

. . . . .

Q. But you did hear some conversation between Mr. Zweifel and Mr. Erwin where Mr. Zweifel was saying that, "My son doesn't lie," or, "You can't call my son a liar," and Mr. Erwin saying, "You're not big enough to tell me how to run the school," or words to this effect, isn't this true?

A. Are you saying that that happened after—

Q. I thought you testified that was being said while you were closing the door to this room?

A. That's correct.

\* \* \* \* \* \*

Q. All right. Did you see any kind of weapon, instrument or implement of any kind, in the possession of Mr. Zweifel at any time?

A. No.

Q. Did you ever hear Mr. Zweifel call Mr. Erwin any names or use any profanity?

A. No.

\* \* \* \* \* \*

*DEFENDANT'S CASE*

*Carl Zweifel*

Q. What, if anything, was said by Mr. Erwin after you told him you wanted your father to straighten out that you weren't lying?

A. He said, "If I ever catch you lying I'm going to give you a whipping."

Q. What, if anything, did your father say then?

A. Dad told him he didn't want him to whip any of his kids.

Q. Just go ahead and tell what was said, and by whom it was said, and what transpired.

A. When Dad told him he didn't want him whipping any of his kids, Mr. Erwin kind of grabbed Dad's right arm—Dad's left arm.

Q. What, if anything, did your father say or do?

A. I can't remember him saying anything, but at that time when Mr. Erwin grabbed Dad's arm, Dad swung at him.

.　　.　　.　　.　　.

A. Dad swung at him, and at that time Mr. Erwin pushed Dad up against the wall where he hit Dad a couple of times.

Q. Pushed him against the wall and what?

A. Hit Dad a couple of times.

Q. Where did he hit your father?

A. Up in the chest, I believe.

Q. All right.

A. Then at that time Mr. Kimberly slammed into Dad when Dad was against the wall and hit Dad a couple of times. And Dad kept saying, "Let go of me, let go of me." I don't remember if Mr. Erwin let go of him or if Dad got loose. The next thing I remember Mr. Erwin had his left arm in Dad's throat pulling Dad's right hair—his right hand pulling Dad's hair.

Dad just kept saying, "Let go of me, let go of me." At that time there was a couple of teachers around and they let go. Dad bent down and picked up his hat, and Mr. Erwin bent down and picked up his tie.

.　　.　　.　　.　　.

Q. All right. When they let your father go what did your father do? Did he make any effort to strike anybody?

A. Huh-uh.

Q. Did you ever hear your father make any threats of any kind against anybody?

A. Huh-uh.

Q. Did you ever hear your father call Mr. Erwin or anybody any names?

A. Huh-uh.

Q. Did you ever hear—did your father have anything in his hands at any time? Any kind of implement or instrument?

A. No.

Q. After they let your father go what happened?

A. Mr. Erwin grabbed my arm pretty hard and told me to get back to class.

.　　.　　.　　.　　.

Q. You don't recall. What happened when Mr. Erwin grabbed your arm and told you to get back to class?

A. Dad grabbed his arm and told him to keep his hands off of me.

Q. All right. Just go ahead and describe what took place.

A. At that time Mr. Erwin grabbed Dad and threw him up against the wall and said, "You ain't big enough to tell me anything." At that time Mr. Erwin slapped Dad across the face, and Dad pushed him, and they hit the desk and rolled on the floor, and a couple of teachers ran in, and they got up, and that was it. We left.

.　　.　　.　　.　　.

Q. At any time that morning did you hear your father call anyone any names?

A. No, I did not.

Q. Did you see your father threaten or hear your father threaten to hurt anybody there that morning?

A. No.

\* \* \* \* \* \*

Q. Tell me again what you remember happening right there?

A. He said, "What are you doing out of class?" And I said, "I just want to straighten this out about Tuesday with you," and Mr. Erwin said, "I don't want to catch you lying or I'm going to give you a whipping." Dad said, "I don't want you whipping any of my kids." At that time Mr. Erwin grabbed Dad's arm and Dad swung at him.

Q. As a matter of fact, Carl, you have previously testified, have you not, that the exact quote which your father made was, "Dad told him he was never going to give any of his kids a whipping"? You have previously testified to that, have you not?

A. Yes.

Q. Is that pretty much the way you remember what your father said?

A. Yes.

Q. Now your testimony was that Mr. Erwin then grabbed your father's left arm. Which hand did he use to grab his left arm?

A. He used his right.

Q. His right arm. They were facing one another, were they not?

A. Yes.

Q. And he grabbed your father's left arm with his right arm. And then your testimony is that your father hit him, hit Mr. Erwin in the chin, isn't that right?

A. No.

Q. That's not the way you remember it?

A. No.

Q. Where do you remember that your father struck him?

A. It was in the jaw. I ain't sure if he hit him or not. He might have. If he did it was a graze.

Q. You previously testified your father struck him with a grazing blow to his chin?

A. Yes.

Q. Is that the way you remember it now?

A. Yes.

Q. Okay, so it wasn't the jaw. It was the chin, right?

A. Yes, the lower part of his jaw, whatever you want to call it.

Q. Now you testify Mr. Erwin got your dad against the wall. Was it this wall that he had him against right here?

A. No, it was more in the corner.

. . . . .

Q. Had Mr. Kimberly arrived on the scene by that time?

A. Yes.

Q. He was there at the time?

A. Yeah.

Q. I believe you testified then that Chris Kimberly "Hit Dad a couple of times"?

A. Yes.

Q. Which hand did he hit him with?

A. His right.

Q. Hit him with his right hand?

A. Yes.

\* \* \* \* \* \*

Q. Then your testimony was that Mr. Erwin got your father in a headlock. Now, which hand did he use to do that?

A. Had his right hand around Dad's head, and his other hand was here.

\* \* \* \* \* \*

Q. I believe you testified in direct that your recollection was there was a statement made by Mr. Erwin to your father that, "You're not big enough to tell me anything"?

A. Yes.

Q. Are you quite certain that's the way that quote was made?

A. Yes.

Q. Is it possible in anyway you may have been confused about that and in fact the quote that was made was, "You're not big enough to come up here and tell me how this school is going to be run"?

A. No, I believe I stated it right.

Q. The way you recall it?

A. Yes.

. . . . .

Q. This was after everything had cooled off and the second occurrence happened. You were standing inside the office by that time, were you not?

A. Yes.

Q. And did you see your father lunge at Mr. Erwin and push him back into the office?

A. No, I did not.

Q. You don't remember that?

A. No, sir. I know he never.

Q. How do you remember it?

A. Mr. Erwin grabbed my arm and told me to get back to class. Dad grabbed his arm and told him to keep his hands off me, and at that time Mr. Erwin grabbed Dad and threw Dad against the wall.

* * * * * *

Q. My question is how did Erwin and your father end up here?

A. Mr. Erwin grabbed my father and threw him against the wall.

* * * * * *

*Merle Zweifel:*

Q. What, if anything, was the first word spoken by either you or Mr. Erwin, whoever spoke first?

A. The first thing he said, he looked up at Carl and me and says—I'd call it a shout, but it may be interpreted other ways—he yelled at Carl and said, "What are you doing out of class?"

Q. What if anything did Carl say?

A. He said, "I come up here with my dad to talk to you."

Q. Did Mr. Erwin speak to you or recognize you at all as being there up to that time?

A. No, he didn't.

Q. Just tell in your own words now what transpired then from the time Carl said, "I brought my father up to talk to you," or words to that effect. What did you say or Mr. Erwin say and just tell in the order in which it happened as nearly as you can remember.

A. We stood out there and I told Mr. Erwin that Carl did have an excuse for them two days. I stated to him that I didn't want Mr. Erwin whipping any of the children for any reason. That was the words I used.

Q. What tone of voice were you talking in at this time and what was your state of mind so far as being angry or calm or what?

A. Well, I'd say upset somewhat.

Q. Were you angry?

A. No, I wasn't.

Q. Up to that time had anything been said about whipping your children by Mr. Erwin?

A. He did state it there in the hall that he did have the right and he would whip Carl if he caught him lying.

Q. Did you make any statement to him about whether or not your son would lie to him or wouldn't lie to him?

A. I did state that Carl didn't lie.

Q. Just go ahead and tell what transpired then from that time on. What happened in order in which it happened?

A. Well, we stood there and argued a little bit. He grabbed hold of my arm.

Q. Who grabbed your arm?

A. Mr. Erwin grabbed my arm and shoved me up against the wall.

Q. What if anything did you say to him when he did that?

A. When he grabbed my arm and pushed me I did swing at him.

Q. Had you made any statement to him about letting go of you before you swung at him?

A. I don't recall.

Q. When you swung at him did you hit him? Do you know?

A. No, I did not hit him.

Q. All right. What happened then after you swung at him when he grabbed your arm and pushed you up against the wall?

483

A. Well, he grabbed me by the throat, like this here, and pushed me up against the wall and then commenced to use his body to slam me up against the wall.

Q. Did you make any statement or say anything to him while he was doing this?

A. Yes, I asked him to stop.

. . . . .

Q. What if anything did Mr. Kimberly do when he came on the scene?

A. Immediately coming out of the room there Mr. Kimberly come up and struck me several times.

Q. Where did he hit you or whatever he did to you?

A. In the body.

Q. All right. Just go ahead and tell me in your own words what happened.

A. At this point here I asked Mr. Erwin to let go of me, and he didn't. He grabbed hold of my head, had me in a headlock. Slammed me up against the side of the wall. All right, about this time after Mr. Kimberly had come out of the room, Mike Palmer or one of the other teachers did come out and he made this statement here. He said, "Break it up," like that, and we broke it up.

Q. Did Mr. Erwin and Mr. Kimberly release you then at that time? Let go of you and step back?

A. Yes.

Q. Did you make any effort to strike either one of them after that or not?

A. No.

Q. Did you at any time make any threats to do anything to either Mr. Kimberly or Mr. Erwin?

A. No.

Q. Did you at any time use any profanity or swearing or cursing at any of them?

A. No.

Q. What happened then after they released you and whoever was there was just standing in the hallway? What happened then?

A. At this point here I planned or my intentions was of going home. I could see—getting Carl and going home. I looked over and he had Carl lodged against the wall, Mr. Erwin did, and had his right hand on his shoulder or his arm. I don't know which. At this point he was a little bit upset because I had stated I didn't want him whipping the kids. I asked Mr. Erwin to remove his hand, and he at this point he shoved—well, throwed me against the wall is what he did.

Q. Then what did you do?

A. I didn't do anything.

Q. What happened then? How did you ultimately get into the office?

A. This was in the office.

Q. Did you and he then have a struggle that ultimately resulted in falling over a filing cabinet or what?

A. Yes, we did, but previous to this here he had me up against the wall, and he had his forearm in my neck again, and he slapped me across the face and made the statement that I wasn't big enough to tell him anything. He had made this statement previously out in the hall in the first argument out there, scuffle or whatever.

Q. Then what did you do, if anything, with reference to pushing or trying to get away or whatever happened?

A. At the point where he—just pushed the man off of me.

Q. Was it when you were pushing him off of you that the struggle started that you fell over the filing cabinet or not?

A. Yes, it was. I pushed him off, and I think he had hold of my hands. We spun around and fell to the ground.

. . . . .

Q. Mr. Zweifel, did you at any time attempt to choke Mr. Erwin after you were down on the floor?

A. Absolutely no.

Q. Did you strike at him with an open hand while you were on the floor?

A. Absolutely not.

Q. What did you do after you got on the floor or were you trying to do?

A. I was just getting up.

\* \* \* \* \* \*

Q. Do you know whether or not that mark was on your finger at the time you went to the school to talk with Mr. Erwin? Was that mark on your finger when you went to talk with Mr. Erwin?

A. No, it wasn't.

Q. How did that mark get on your finger?

A. Mr. Erwin had my arm behind my back at this point. This was when he was holding my hair.

Q. Does that picture fairly and accurately represent the mark that was on your hand after the scuffle that was not there before?

A. Yes, it does.

Q. You notice the picture has a mark on it near the base of the nose. Did you have that mark on your nose when you went up to talk to Mr. Erwin?

A. No, I didn't.

Q. Do you know when or how you got that cut or abrasion that a little blood ran down your nose?

A. This cut here was received when Mr. Erwin had me lodged against the wall inside the principal's office.

Q. Mr. Zweifel, when you went—

A. Let me clarify that a little more. He did strike me at this point.

Q. Mr. Zweifel, did you at any time, either before you went to the schoolhouse or any time you were up there in the presence of Mr. Erwin, ever intend to do bodily harm to him?

A. Absolutely not.

\* \* \* \* \* \*

Q. Mr. Zweifel, I believe also that you testified that you never did hit Carson Erwin?

A. That's absolutely true.

Q. I want to ask you, Mr. Zweifel, when you went inside the office there with Mr. Erwin, I believe your testimony was he had you pushed up against the wall, is that right?

A. My testimony was he throwed me against the wall.

Q. Immediately thereafter Mr. Erwin went across the filing cabinet and the desk. Is that—

A. No, it wasn't immediately thereafter. It was shortly thereafter. What I'm saying is after he throwed me up against the wall, then he lodged his forearm against my throat and then struck me across the head. Then we did as you stated.

Q. ... I would like for you to tell the Court where you and Mr. Erwin were at the time that you—from the time you were up against the wall there and then went across the filing cabinet and desk.

A. As far as I can determine we was— Mr. Erwin had me lodged against this wall right here.

Q. Then what happened?

A. Well, then he struck me across the head.

Q. Were you still up against the wall at that time?

A. Yes, I was.

Q. Then what happened?

A. I pushed the man off of me.

Q. Then where did he go? What happened to him?

A. As I pushed Mr. Erwin off he grabbed hold of my hands and we both spun around right here.